## OPERATIONS TRANSFER AGREEMENT

THIS OPERATIONS TRANSFER AGREEMENT (this "**Transfer Agreement**") is made this 26th day of August, 2016 (the "**Effective Date**") by and between GGNSC Broken Bow LLC, ("**Operator**"), and Broken Bow Care and Rehabilitation Center LLC ("**New Operator**").  Operator and New Operator are sometimes hereinafter referred to individually as a "**Party**" and collectively referred to as the "**Parties**." Capitalized terms shall have the meanings set out in Section 35 hereof.

## RECITALS

WHEREAS, Operator operates that certain nursing facility located in Nebraska (the "**State**") and commonly known as Golden Living Center-Broken Bow (the "**Facility**"), and certain tangible assets relating to such operation.

WHEREAS, Operator is currently the licensed and certified provider at the Facility.

WHEREAS, at Closing and subject to securing the New License (as defined below), an affiliate of Operator will lease the Facility to New Operator and in conjunction therewith, Operator intends to sell, transfer, convey and assign to New Operator the operations of the Facility and certain of the Assumed Contracts, and New Operator proposes to acquire, assume and accept such operations and Assumed Contracts from Operator, pursuant to, and in accordance with, the terms and conditions of this Transfer Agreement.

WHEREAS, Operator and New Operator are interested in documenting the terms and conditions on which such sale, transfer, conveyance and assignment will occur.

NOW, THEREFORE, in consideration of the foregoing, the covenants, agreements, representations and warranties hereinafter set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

1.  <u>Incorporation of Recitals.</u>  The aforesaid Recitals are hereby incorporated into this Transfer Agreement as if fully set forth herein.

2.  <u>Assets and Surrender</u>.

    (A)  Operator agrees that its rights and obligations in and to the Facility and all rights of Operator to occupy or otherwise operate the Facility shall terminate as of the Closing Date except those rights which survive pursuant to this Transfer Agreement.  With respect to the Facility, on the Closing Date, Operator shall deliver, convey and transfer to New Operator ownership of those items set forth in subsections (i) through (ix) below and New Operator shall accept the following assets (the "**Assets**"):

        (i)  All Assumed Contracts (as such term is defined in Section 13 of this Transfer Agreement)  pursuant to Section 13 of this Transfer Agreement, excluding, however, rights, claims or responsibilities thereunder existing and relating to the period of time prior to the Closing Date;

        (ii)  In accordance with Section 4 of this Transfer Agreement, all intangible property, in which Operator has an interest, now or hereafter used in connection with the

**EXHIBIT A**

operation of the Facility ("**Intangibles**"), such as Operator's licenses, permits, certificates, waivers, consents, authorizations, (subject to the rights of the owner of the Facility) covenants, variances, approvals, certificates of occupancy, utility lease agreements, telephone numbers, warranties and accreditations with respect to the Facility and/or the Assets to the extent assignable by Operator and assumed by New Operator;

(iii)  In accordance with <u>Section 4</u> of this Transfer Agreement, the rights of Operator under any provider agreements with Medicare or Medicaid (excluding the right to any reimbursement relating to services provided at the Facility before the Closing Date, and all obligations relating to services provided before the Closing Date), to the extent assignable by Operator and assumed by New Operator;

(iv)  In accordance with <u>Section 11</u> of this Transfer Agreement, the Facility Records;

(v)  All Patient Trust Funds (as defined in <u>Section 10</u>) pursuant to <u>Section 10</u> of this Transfer Agreement;

(vi)  All other assignable and transferrable personal property or other intangible or tangible assets, properties, rights and business of every kind and nature owned exclusively  by Operator on the Closing Date, known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, whether or not specifically referred to in this Transfer Agreement used or maintained in connection with the operation of the Facility to the extent not expressly excluded, subject further to the provisions of this Transfer Agreement;

(vii)  All inventory and supplies owned by Operator located at the Facility on the Closing Date (as defined in <u>Section 3</u> of this Transfer Agreement), including, but not limited to, office, foodstuffs, medical, disposables, prescription medications and pharmaceutical inventories and supplies and other inventories and articles of personal property of every kind and nature attached owned by Operator in connection with the Facility (the "**Inventory**");

(viii)  In electronic or virtual form, all policies and procedure manuals and operating manuals necessary for survey purposes, and the 2016 marketing, sales and promotional kits and materials of Operator (the "**Policy and Procedure Manuals and Marketing Materials**"); provided, however, New Operator shall only be permitted to use the Policy and Procedure Manuals and Marketing Materials for a period of sixty (60) days after the Closing Date (the "**Return Date**") on which Return Date New Operator will, at its sole cost and expense, return to Operator all items contemplated by this Section 2(A)(viii); and provided, further (i), to the extent that New Operator uses the Policy and Procedure Manuals and Marketing Materials between the Closing Date and the Return Date, New Operator shall be required to place its name thereon; and remove the name of Operator and its affiliates; (ii) notwithstanding the foregoing, Operator agrees that New Operator may retain one set of Operator's Policy and Procedure Manual in electronic or virtual form following the Return Date for historical reference purposes only (and not for ongoing operational purposes), which set will not be replicated or used for any commercial or for-profit use; and (iii) the Parties acknowledge Operator makes no representation or warranty as to the compliance of the Policy

**EXHIBIT A**

and Procedure Manuals and Marketing Materials with applicable law, and Operator shall not liable for any use thereof by New Operator; and

(ix)     All petty cash of Operator at the Facility on the Closing Date.

(B)     All assets of Operator set forth on Schedule 2(B), attached hereto and made a part hereof, shall not be transferred to New Operator pursuant to this Transfer Agreement (collectively, the "**Excluded Assets**").

(C)     **EXCEPT AS SET FORTH IN THIS TRANSFER AGREEMENT, IT IS EXPRESSLY AGREED THAT NEW OPERATOR ACCEPTS THE FACILITY, THE INVENTORY, ANY FURNITURE, FIXTURES AND EQUIPMENT AT THE FACILITY AND ANY OTHER ASSET, PROPERTY, OR RIGHT TRANSFERRED BY OPERATOR TO NEW OPERATOR, "AS IS, WHERE IS, AND WITH ALL FAULTS" AS OF THE CLOSING DATE. EXCEPT FOR THOSE EXPRESSLY SET FORTH IN THIS TRANSFER AGREEMENT, OPERATOR HAS NOT MADE ANY REPRESENTATION OR WARRANTY REGARDING ANY OF THE FOREGOING ASSETS, PROPERTIES AND RIGHTS OR ANY OTHER MATTER REGARDING OR RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY. EXCEPT FOR THOSE EXPRESSLY SET FORTH IN THIS TRANSFER AGREEMENT, OPERATOR HEREBY DISCLAIMS, AND NEW OPERATOR FOREVER WAIVES AND RELEASES, ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE FOREGOING ASSETS, PROPERTIES AND RIGHTS OR ANY OTHER MATTER REGARDING OR RELATING TO THE TRANSACTION CONTEMPLATED HEREBY, INCLUDING, BUT NOT LIMITED TO, THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR USE.**

(D)     Notwithstanding anything to the contrary set forth in this Transfer Agreement, New Operator does not assume, pay, perform, satisfy or discharge any liability or obligation of any kind or nature, except to the extent expressly and unambiguously expressed herein to the contrary, that arises from, out of, or relates to the Operator's ownership of the Assets, the Facility or any activity of Operator prior to the Closing Date or conduct of the Operator after the Closing Date (the "**Excluded Liabilities**").

(E)     New Operator shall assume, perform and discharge the liabilities of Operator arising from or in any way related to all of the following (collectively, the "**Assumed Liabilities**"), which shall be effective as of the Closing Date:

(i)      operations of the Facility on or after the Closing Date and the provision of residency to the residents of the Facility and all health care, personal care, pharmaceuticals and other goods and services to the residents of the Facility;

(ii)     to the extent transferred in accordance with Section 10 hereto, the custodial and fiduciary responsibilities associated with the Patient Trust Funds on or after the Closing Date; and

(iii)    the Assumed Contracts, including Operator's rights and interests in and to Medicare provider numbers and Medicare provider reimbursement agreements of Operator for the Facility.

**EXHIBIT A**

(F)     Operator and New Operator shall comply in all material respects with all applicable laws, and with all applicable rules and regulations of all Governmental Entities, in conjunction with the execution, delivery and performance of this Transfer Agreement and the transactions contemplated hereby. On and after the Closing Date, New Operator shall be solely responsible for caring for the residents of the Facility. New Operator shall preserve the existence and maintain the confidentiality of the resident records transferred to New Operator pursuant to this Transfer Agreement in accordance with federal and state law.

3.   Closing. Upon the terms and subject to the conditions set forth in this Transfer Agreement, the closing of the transaction contemplated herein (the "**Closing**") shall take place with an effective time of 12:01 a.m. (the "**Effective Time**") on October 1, 2016, the date anticipated to be set forth in the New License (as hereinafter defined) as the date on which New Operator is licensed to operate the Facility, which date shall, unless agreed otherwise by Operator in the exercise of its sole discretion, be required to be the first day of a month. The date on which the Closing and the Effective Time actually occurs is referred to herein as the "**Closing Date**."

4.      Nursing Home License and Provider Agreements.

(A)     New Operator will file within fourteen (14) days of the Effective Date an application for a license to operate the Facility (the "**New License**") with the Nebraska Department of Health & Human Services or applicable State agency (the "**Department**") and New Operator shall file applications for the Ancillary Permits and Approvals (as hereinafter defined) as and when permitted or required under the laws of the applicable issuing authority.    Notwithstanding the foregoing, to the extent New Operator undertakes commercially reasonable, good faith efforts to submit the application for the New License to the Department, including regularly providing Operator with updates as to its progress, then Operator shall extend the time period for filing such application for up to two (2) additional seven (7) day periods. New Operator will provide Operator with a copy of its filed application for the New License within one (1) business day after its receipt of a request therefor from Operator. New Operator shall diligently proceed to secure the New License and the Ancillary Permits and Approvals and shall (i) from time to time, upon request of Operator, advise Operator of the status of New Operator's efforts to secure the New License and the Ancillary Permits and Approvals, (ii) promptly advise Operator once New Operator has received confirmation of the date on which the New License will be issued, and (iii) promptly upon receipt of a request therefor from Operator, shall provide Operator with copies of the document(s) evidencing the New License. For purposes hereof, "**Ancillary Permits and Approvals**" shall mean all ancillary permits or licenses required for the operation of the Facility from and after the Closing Date including, but not limited to, the Medicare tie in notice and Medicaid provider agreement, business licenses, food service permits, elevator permits, vending machine permits, beauty shop licenses and CLIA waivers. Hereinafter the New License and the Ancillary Permits and Approvals will be collectively referred to as the "**Regulatory Approvals**."

(B)     Operator and New Operator acknowledge and agree that, pursuant to 42 C.F.R. §§ 442.14(a) and 489.18(c), subject to New Operator meeting the governmental requirements for being certified to participate in the Medicare Program at the Facility, Operator's Medicare Provider Agreement will be automatically assigned to New Operator by the Centers for Medicare and Medicaid Services ("**CMS**") and that New Operator will be required to apply to the Department for the issuance to New Operator of

**EXHIBIT A**

a new Medicaid Provider Agreement. Effective as of the Closing Date, Operator assigns to New Operator such Medicare Provider Agreement and its right thereunder to continued participation in the Medicare program. Operator further agrees to provide such letters, verifications and other documents to CMS, the Department and New Operator as may be reasonably required to effectuate the assignment of Operator's Medicare Provider Agreement and the issuance to New Operator of its own Medicaid Provider Agreement. New Operator assumes no obligations, nor is New Operator entitled to any benefits, of Operator under its Provider Agreements for any time prior to the Closing Date.

(C)     To the extent permitted by law, and notwithstanding anything to the contrary set forth in Section 4(B), New Operator shall be entitled to bill under Operator's Medicare provider number from and after the Closing Date on the terms and conditions set forth in this Section 4(C). The period during which such billing is permitted shall terminate upon the earlier of (i) one hundred eighty (180) days after the Closing Date, or (ii) the earlier of the date on which (A) New Operator or Operator receives notice from the Medicare program questioning the propriety of any billing submitted by New Operator using Operator's Medicare provider number, or (B) New Operator is issued a tie-in notice by CMS or the applicable fiscal intermediary acting on behalf of CMS (the "**Interim Billing Period**"). To the extent permitted by applicable law, the Parties shall, at New Operator's request, enter into a similar arrangement regarding Operator's Medicaid provider number. Any amounts received by Operator in connection with any Medicare or Medicaid billings pursuant to the rights granted to New Operator under this Section 4(C) shall be remitted by Operator to New Operator in accordance with the provisions of Section 8 of this Transfer Agreement.

(D)     Each Party agrees to cooperate with the other Party in effecting a change in operation of the Facility for the purposes of licensing and certification in order to ensure the continuous and uninterrupted operation of the Facility as a licensed skilled nursing facility, including, but not limited to, Operator providing such notice to the residents of the Facility of the transfer to New Operator of operational and facility responsibility for the Facility as may be required under applicable law and executing such documents and surrendering the existing License and Provider Agreements as may be required in connection with the issuance of the New License and the Ancillary Permits and Approvals to New Operator; provided, however, that Operator shall not be required to incur any costs in connection with such change in operation it being understood and agreed that New Operator shall be solely responsible for any and all costs associated with obtaining the New License and Ancillary Permits and Approvals, including, but not limited to, any physical plant or other changes required to bring the Facility into compliance with the currently effective licensure and certification or other legal requirements, provided that Operator shall be responsible for any costs associated with maintaining the current compliance of the Facility to operate as a duly licensed skilled nursing facility under its License and pursuant to its Provider Agreements through the Closing Date.

(E)     For the avoidance of doubt, the Closing shall be conditioned solely on the issuance of the New License or such assurances regarding such issuance and authorization to proceed with such transaction in accordance with Section 18(A), and not on the issuance of any of the other Ancillary Permits and Approvals. New Operator acknowledges that it is not expected to have received a "tie-in" notice from CMS, a new Medicaid Provider Agreement or other third party payor provider agreements as of the Closing Date and that, except as otherwise specifically permitted under this Section 4, it shall have no right to bill Medicare, Medicaid, or any other third party payor for services rendered by New

**EXHIBIT A**

Operator on or after the Closing Date until such time as such tie in notice, new provider agreements and/or new third party payor contracts, as applicable, have been issued to New Operator.

5.     <u>Cost Reports</u>. Operator shall prepare and file its final Medicaid cost report with the Department (or appropriate State Medicaid authority) and Medicare cost report with Operator's fiscal intermediary with respect to its operation of the Facility for the time period ending on the Closing Date, as soon as practicable after the Closing Date, but in no event later than the date each report is due, including any applicable extension period(s). Operator shall thereafter timely provide (or cause its public accountants to provide) any additional information which may be reasonably requested by the State agency or CMS with respect to such final cost report or any prior cost report. On Operator's receipt of New Operator's written request, Operator shall provide (or cause its public accountants to provide) New Operator with a copy of all such cost reports (and back up financial data) and any additional information submitted to the State agency and CMS in conjunction with such cost reports. All proceeds from Operator's cost report (including, without limitation, any appeals, settlements, and retroactive Medicaid rate increases) shall remain the property of Operator, and New Operator shall promptly forward any such proceeds and any related reports or correspondence to Operator.

6.     <u>Employees</u>.

(A)     New Operator shall offer employment to certain employees of Operator in accordance with this <u>Section 6</u>:

(i)     Operator shall terminate the employment of all employees at the Facility, including, without limitation, persons temporarily absent from active employment by reason of disability, illness, injury, workers' compensation, approved leave of absence or layoff ("**Operator's Employees**"), as of 11:59 p.m. on the day immediately preceding the Closing Date ("**Termination Date**"). Operator shall be responsible for the payment to Operator Employees of all salaries, wages, benefits or other amounts due and payable under applicable law and/or the policies and procedures of Operator for periods before 11:59 p.m. on the Termination Date. Operator shall timely pay to all applicable Governmental Entities all employment-related taxes due with respect to Operator's Employees for periods before 11:59 p.m. on the Termination Date, including Operator's share of all FICA, state and federal unemployment taxes and workers' compensation insurance premiums.

(ii)     Except as specifically set forth in Section 6(A)(iii) to the contrary, New Operator shall have no liability for any salaries, wages, benefits or other amounts due employees of Operator relating to the period of time prior to the Closing Date. New Operator shall offer immediate employment (so that no period of unemployment shall occur between employment with Operator and employment with New Operator) to a sufficient number of Operator's employees so as to ensure that there will be no violation of the Worker Adjustment and Retraining Notification Act or any comparable state or local laws with such employment to commence at 12:01 A.M. on the Closing Date ("**Transferred Employees**"). If New Operator fails to offer immediate employment to a sufficient number of employees, New Operator agrees that it shall fully indemnify Operator for any associated liabilities arising under the Worker Adjustment and Retraining

54580075.2

**EXHIBIT A**

Notification Act or any comparable state or local laws.  Prior to the Closing Date, New Operator shall identify to Operator all Operator Employees to which New Operator will not offer employment.  Employment for Transferred Employees shall be offered by New Operator on such terms, conditions, salary, wage, and benefit levels which are comparable to those terms, conditions, salary, wage, and benefit levels as provided by Operator. In furtherance and not in limitation of the foregoing, New Operator shall treat prior service with Operator as service with the New Operator for purposes of determining eligibility to receive and participate in all benefits programs maintained by New Operator. This Transfer Agreement shall not be deemed to create or grant to any Transferred Employee any third party beneficiary rights or claims or any cause of action of any kind or nature.

(iii)    At New Operator's sole cost and expense, New Operator shall be responsible for providing Transferred Employees with health care coverage on and after the Closing Date sufficient to extinguish any rights a Transferred Employee may have to continuation of health care coverage under Operator's health care plans including, but not limited to, COBRA insurance coverage, if a Transferred Employee so elects such coverage.  New Operator shall not bear any responsibility whatsoever for notices or insurance coverage, COBRA or otherwise, for any of Operator's Employees who are not Transferred Employees. Further, New Operator shall permit Transferred Employees to enroll in New Operator's group health plan on or as soon as practicable after the Closing Date, with no eligibility waiting period for participation in such plan, at the rate and level provided by New Operator under their benefit programs.

7.    Expenses/Deposits/Closing Costs.

(A)    Revenues and expenses for the billing period(s) in which the Closing Date occurs, including, but not limited to, personal property taxes, prepaid expenses and other related items of revenue or expense attributable to the Facility shall be prorated between Operator and New Operator as of the Closing Date.  In general, such prorations shall be made so as to reimburse Operator for prepaid expense items and to charge Operator for prepaid revenue items to the extent that the same are attributable to periods on or after the Closing Date.  The intent of this provision shall be implemented by New Operator remitting to Operator any invoices which reflect a service or delivery date before the Closing Date and by New Operator assuming responsibility for the payment of any invoices which reflect a service or delivery date on and after the Closing Date, provided the New Operator assumes such service. Notwithstanding the foregoing, New Operator acknowledges and agrees that it shall have no right, title or interest in and to any retroactive workers compensation insurance program payments whether or not the same are paid prior to or after the Closing Date if and to the extent they relate to any period prior to the Closing Date. For the avoidance of doubt, any bed tax or similar provider taxes or fees shall be prorated between Operator and New Operator based on the period of its operation of the Facility occurring before and after the Closing Date, as the case may be, including, but not limited to, any such assessments made by the State and/or paid by Operator prior to the Closing Date that would apply to operation of the Facility after the Closing Date.

(B)    Any and all deposits paid by Operator with respect to the Facility, including without limitation any and all equipment lease, security and/or utility deposits paid to, and/or cash

**EXHIBIT A**

or other collateral held by any equipment lessor or by any utility, insurance company or surety, shall remain the sole and exclusive property of Operator and New Operator shall have no right or interest therein or thereto, and to the extent that Operator does not receive a return of any such deposit on the Closing Date and such security deposit has been assumed by New Operator, New Operator shall reimburse the Operator on the Closing Date the full amount of any such security deposit assumed by New Operator. In furtherance of the foregoing, New Operator and Operator shall work to transition the utilities serving the Facility into the name of New Operator effective as of the Closing Date.

(C)     All such prorations shall be made on the basis of actual days elapsed in the relevant accounting or revenue period and shall be based on the most recent information available. Without limiting the foregoing, water, electricity, sewer, gas, telephone and other utility charges shall be based, to the extent practicable, on final meter readings and invoices covering the period of time through the Closing Date.  Utility charges which are not metered and read on the Closing Date shall be estimated based on prior charges, and shall be re-prorated upon receipt of statements therefor.

(D)     All amounts owing under this Section 7 from one party hereto to the other party hereto that require adjustment after the Closing Date shall be settled within sixty (60) days after the Closing Date or, in the event the information necessary for such adjustment is not available within said sixty (60) day period, then as soon thereafter as practicable.

(E)     New Operator shall allow Operator to have access to the Facility's business office manager during normal business hours after the Closing Date to, among other things, facilitate the completion by Operator of its accounting and financial close for the month prior to the Closing Date, complete the billing for and collection of accounts receivable related to, goods sold and services provided by Operator prior to the Closing Date and other financial/accounting related services related to the operation of the Facility by Operator prior to the Closing Date, provided that Operator shall exercise such access rights on terms which are not disruptive to the operations at the Facility and which do not materially interfere with the ability of the business office manager to perform her/his duties for New Operator from and after the Closing Date, at the expense of the Operator.

(F)     In addition to any costs for which New Operator is responsible under this Section 7 and under Section 4 hereof, New Operator shall be solely responsible for all costs, fees and expenses incurred by it in connection with the transfer of operations of the Facility as contemplated hereunder, including, but not limited to, the cost of any training of the Facility's employees which it may elect to undertake with the approval of Operator, which approval shall not be unreasonably withheld, conditioned or delayed, provided such training is conducted in a manner which does not disrupt the operation of the Facility prior to the Closing Date, and the cost of any due diligence that it undertakes in furtherance of such transfer of operations, including but not limited to, the costs of any examination or copying by New Operator or its agents of any books, records, patient files or other operational or fiscal information and data of any kind of Operator or the Facility. In furtherance and not in limitation of the foregoing, in the event that in the process of any such employee training and/or due diligence examinations Operator shall incur any out of pocket costs or expenses related to the use of its employees, equipment and/or the provision of any such information, New Operator shall, within seven (7) days after a written demand therefor accompanied by reasonably detailed supporting documentation, reimburse Operator for all of such out of pocket costs and expenses.

54580075.2

**EXHIBIT A**

(G)     New Operator will pay any sales and use or similar taxes resulting from or payable in connection with the sale of the Assets pursuant to this Transfer Agreement and shall remit the same to the proper taxing authorities unless Operator is required, as a matter of law, to be the remitting party in which case New Operator shall remit the payment(s) to Operator and it shall, in turn, remit the same to the proper taxing authorities. Operator shall be responsible for and shall pay any of its own income, capital gains, or similar tax that may be required to be paid as a consequence of the sale of the Assets.

8.    Accounts Receivable.

(A)     Subject to the terms of this Section 8(A), New Operator agrees that, as of the Closing Date, Operator will have uncollected accounts receivable for services and goods rendered by Operator to the residents of the Facility (the "**Accounts Receivable**"), which term shall include (i) the Private A/R and the receivables under Title XVIII of the Social Security Act ("**Medicare**"), and (ii) Title XIX of the Social Security Act ("**Medicaid**") including, without limitation, Medicaid lag payments related to services provided prior to the Closing Date and based upon certain metrics as determined by the State. The Parties acknowledge that the Medicaid lag payments represent amounts in addition to the normal Medicaid payment structure. Further, there is significant potential that Operator and New Operator will from time to time receive certain funds due to the other, and until receipt of a "tie-in" notice from CMS, the Parties agree that Operator is likely to receive funds which are due to New Operator for services and goods provided by New Operator to Residents of the Facility after the Closing Date. Each Party agrees to prepare and provide to the other Party a "Due To/Due From" Schedule in substantially the form set out hereto as Schedule 8(A) no less than twice per week for the period of one-hundred eighty (180) days following the Closing Date with supporting documentation, so that each Party can determine the status of funds owed to it, and thereafter as necessary (but no less than once every two weeks) until Operator has collected all amounts due to it.  To the extent that one Party receives funds due to the other Party, the Party agrees that it will hold such funds in trust for the other Party, and (i) for Private A/R, including Self-Pay Receivables, of Operator (or similar amounts of New Operator) will remit such funds to the other party within five (5) business days of receipt by delivery of checks or other negotiable instruments evidencing payment, and (ii) for all other Accounts Receivable of Operator (or similar amounts of New Operator), will remit such funds within ten (10) days after the end of each calendar month in accordance with the most recent Schedule 8(A), by electronic funds transfer.

(B)     New Operator and Operator understand and agree that the address for remittance of all non-electronic funds transfer payments on the Accounts Receivable shall remain the current address for ninety (90) days following the Closing Date.

(C)     New Operator agrees to reasonably cooperate with and assist Operator, at Operator's sole cost and expense, in (i) its collection of the private pay and private portion of Medicare and Medicaid receivables (the "**Private A/R**") relating to the period before the Closing Date, (ii) its collection of the portion of Medicare, Medicaid, and insurance company receivables, other than payments under any governmental program or private insurance or managed care program (referred to commercially as "**Self-Pay Payments**") (collectively, the "**Third Party Payor A/R**") for services provided before the Closing Date, and (iii) with implementation of deviations of income for Residents, pending and approved including, without limitation, the deviations of income set forth in Schedule 8(C) (which will be delivered at Closing).  The Parties agree that with respect to payments received by

9

**EXHIBIT A**

New Operator after the Closing Date from or on behalf of residents of the Facility, which Self-Pay Payments do not clearly identify the time period for which payment is made, such Self-Pay Payments shall, for the first sixty (60) day period following the Closing Date, first be applied to the amounts due from such resident of the Facility to Operator for private pay services and goods provided during the period before the Closing Date; *provided*, any excess thereof shall be paid to New Operator as soon as reasonably practicable thereafter.  Following the first sixty (60) days after the Closing Date, Self-Pay Payments which do not clearly identify the time period for which payment is made shall be applied fifty percent (50%) to Operator for services provided prior to the Closing Date, and fifty percent (50%) to New Operator for services provided on or after the Closing Date, until Operator has been paid in full.

(D)     New Operator shall have no obligation to take any affirmative collection efforts on behalf of Operator, other than to supply Operator with any records (subject to all applicable privacy laws), which Operator may reasonably need to collect such amounts; *provided, however*, in connection with Operator's attempts to collect Medicaid funds for services rendered to those Residents with pending Medicaid applications (collectively, the "**Pending Medicaid Applicants**"), each set out on Schedule 8(D), (i) New Operator shall provide Operator with a written monthly progress report on the Medicaid application status of each Pending Medicaid Applicant until such time as all Pending Medicaid Applicants have been approved or denied by Medicaid, and (ii) if New Operator receives any notice or correspondence regarding such applications, New Operator shall provide such notice or correspondence to Operator within five (5) business days following receipt.  New Operator shall, at Operator's sole cost, cooperate with and provide Operator with such documents and information as Operator shall reasonably request to enable Operator to contest any denial or negative determinations by Medicaid with respect to the Pending Medicaid Applicants.

(E)     After the Closing Date and until all Accounts Receivable amounts are paid in full as provided in this Section 8, each Party agrees to make available to the other, on at least two (2) business days' prior written notice and during normal business hours, adequate space, equipment and facilities at the location where the same is kept to permit an employee or agent of the Party to audit, review and process the Accounts Receivable of Operator or the similar accounts receivable due to New Operator, and to provide such employee or agent with full access to all books and records (including, without limitation, ledgers, financial statements and collection records) necessary to determine accurately the processing, collection and payment of any and all amounts due to one Party received by the other to confirm compliance with such other Party's obligations under this Section 8.

(F)     To the extent that New Operator is entitled under Section 4 to utilize the Medicare provider number and/or provider agreement of Operator, New Operator agrees that, in connection with its cost reports submitted following the Closing, New Operator will include in all such cost reports an amount equal to the amount of bad debt carried on the books of Operator arising from services to beneficiaries of the Medicare Program.  On settlement of such amount under the Medicare Program, New Operator will promptly forward all such amounts back to Operator.  New Operator shall continue to include such bad debt amounts on its cost reports until reimbursement for such amounts is finally made or denied.

10

**EXHIBIT A**

(G)     Subject to Section 17(F), if, at any time after the Closing Date, any payor program (including Medicare and/or Medicaid) asserts a right to recoup payments from New Operator solely as a result of claims arising before the Closing Date, Operator shall have the exclusive right to contest any such claims applicable to the period before the Closing Date even if there are no unpaid receivables due to Operator, and shall be liable to New Operator for any and all amounts recouped from New Operator and shall reimburse New Operator for any and all amounts recouped and/or withheld from current payments to New Operator within five (5) business days of notice of such recoupment.

(H)     Without limiting the foregoing and notwithstanding anything else in this Transfer Agreement, if, pursuant to any program for recoupment or audit (including, but not limited to any program operated by or on behalf of any state or federal government payor, or private third party payor, such as the program utilizing recovery audit contractors (a "**RAC**") to be operated under Section 302 of the Tax Relief and Health Care Act of 2006), New Operator receives any notice of overpayment from a RAC or the payor directly or otherwise has funds withheld by any payor as recoupment for any claims relating to the period before the Closing Date, New Operator shall provide written notice of such recoupment and/or the notice of such audit within five (5) business days following receipt of such notice thereof, and thereafter shall provide Operator with such documents and information as Operator shall reasonably request to enable Operator to contest any recoupment or audit findings that results in a proposed recoupment. Subject to Section 17(F), Operator shall remit any and all amounts recouped from New Operator within five (5) days of notice of such recoupment. Subject to Section 17(F), Operator shall have the sole and exclusive authority to contest any audit or recoupment only to the extent that such audit or recoupment applies to amounts relating to the period before the Closing Date and shall be liable to New Operator for any amounts finally determined to be owed pursuant to any such recoupment or audit. If New Operator receives notice of a Medicare recoupment or audit which Operator did not also receive and if New Operator fails to deliver the same to Operator and said failure actually prejudices Operator's right to appeal and/or settle the recoupment or audit, Operator shall have no liability to New Operator for any such audit result or recoupment provided Operator can demonstrate its likelihood of success on appeal. To the extent that Operator is successful in contesting any recoupment or audit which results in the determination of an underpayment, such amount shall be paid by New Operator to Operator within five (5) business days following receipt of any such underpayment.

(I)     Subject to the limitations set forth in Section 17, this provision shall survive the Closing Date.

9.     Utilities.  Operator shall arrange for a final statement with respect to all utilities serving the Facility before the Closing Date and shall pay all costs identified thereon, less any prepaid expenses and/or deposits held by utility providers in the name of Operator. New Operator shall arrange for all such utilities to be billed in its name on and after the Closing Date, and shall pay all fees due therefore on and after the Closing Date.

10.     Patient Trust Funds.  On the Closing Date Operator shall provide to New Operator an accounting of all patient trust funds (the "**Patient Trust Funds**") being held by Operator at the Facility setting forth the names of all residents for whom such Patient Trust Funds are held and the corresponding balance (the "**Patient Trust Fund Schedule**"). Within five (5) business days after the Closing Date or earlier if required by law, Operator, with the cooperation of New Operator, shall transfer, to the extent required by law, the Patient Trust

11

**EXHIBIT A**

Funds to a bank account designated by New Operator.  On delivery of the Patient Trust Funds to New Operator, New Operator shall acknowledge the receipt of such funds in the amount set forth in the Patient Trust Fund Schedule and shall expressly assume all Operator's financial and custodial obligations with respect thereto arising from and after the Closing Date and shall be directly accountable to the residents of the Facility and to any applicable Governmental Entity, for the Patient Trust Funds so transferred to New Operator.

11.   Facility Records.

(A)   On the Closing Date and subject to all applicable confidentiality laws, restrictions and provisions, Operator shall deliver to New Operator all its right, title and interest in and to: (i) the Facility residents' admission, medical and personal records (other than such records that are not required to be maintained by the Operator, in accordance with applicable law), (ii) the original employment records for Operator's Employees who accept employment with New Operator, and (iii) such other records pertaining to the operation of the Facility as may be required for the lawful operation thereof by New Operator and as may not be included in the Excluded Assets ("**Facility Records**"). Operator may make copies of the foregoing and other records deemed necessary by Operator and remove same and other original records for its own records if so desired. New Operator agrees to provide Operator with sufficient work space in the Facility to permit Operator to copy the records contemplated herein and, for purposes of this paragraph, to provide the reasonable cooperation of the employees of the Facility in assisting Operator in locating records for a period of one hundred twenty (120) days after the Closing date. Operator will not leave onsite a copy of the files of deceased and discharged residents, but will maintain the records for deceased and discharged residents at its off-site storage facility, and will deliver such records to New Operator at New Operator's expense as reasonably requested from time to time, including for survey purposes, upon forty-eight (48) hours' notice, unless specifically requested by a surveyor, in which case, such records will be delivered to New Operator within twenty-four (24) hours of such request. The Parties will cooperate to transfer electronic medical records of active residents in a format and by means mutually beneficial to both Parties.  Operator agrees to maintain the Facility Records in the manner required by law.

(B)   New Operator agrees, to the extent permitted by the Health Insurance Portability and Accountability Act ("**HIPAA**") and other applicable laws, rules and regulations, to allow Operator, or its agents or representatives, to examine from time to time such records relating to the period of Operator's operation of the Facility, to promptly cooperate with Operator, its agents or representatives in their examination or review of such records and to promptly provide Operator with copies thereof at Operator's expense.  New Operator agrees to promptly provide access to Operator to protected health information, as defined in 45 C.F.R. § 164.501, for Operator's treatment, payment, and health care operations to the fullest extent authorized by law, including but not limited to the provisions of 45 C.F.R. § 164.506(c).  The Parties agree that New Operator shall have no obligation to obtain any written individual authorization necessary to permit New Operator to disclose protected health information requested by Operator.  This provision shall survive the termination or expiration of this Transfer Agreement. Prior to the Closing Date, the Parties agree that New Operator may access confidential information or protected health information as defined in 45 C.F.R. § 164.501 maintained by Operator or Facility for the purpose of healthcare operations as defined in 45 C.F.R. § 164.506(c).

54580075.2

**EXHIBIT A**

(C)     New Operator and its employees, officers, directors, members, managers, partners, agents and consultants shall cooperate in all reasonable respects, to the extent permitted by applicable law, at Operator's sole cost and expense, with Operator and its attorneys and agents in the investigation, trial and defense of any claim, lawsuit or action, and any appeal therefrom or in connection with any government request, relating to Operator's ownership or operation of the Facility.  Subsequent to the Closing Date, upon reasonable notice, New Operator shall allow, to the extent permitted by applicable law, at Operator's sole cost and expense, Operator and its agents and representatives to have reasonable access to, and to make copies of, the books, records and supporting material of the Facility relating to the period prior to the Closing Date to the extent reasonably necessary: (i) for the processing, reporting, collection, payment and handling of Operator's accounts payable and receivable, (ii) to assist Operator to investigate and defend malpractice or other claims, (iii) to assist Operator in filing or defending tax returns, cost reports or other governmental inquiries which relate to periods prior to the Closing Date, (iv) for all other matters which reasonably require Operator to access, employees, records and other documents at the Facility, and (v) to enable Operator to investigate and defend malpractice or employee claims, to file or defend cost reports and tax returns and to perform similar matters.  Without limiting the generality of the foregoing, in connection with any Medicare audit relating to periods prior to the Closing Date, New Operator shall allow, to the extent permitted by applicable law, at Operator's sole cost and expense, Operator, its agents and representatives and any auditors and their agents and representatives to have access to (i) the Facility and (ii) any and all staff involved with payroll and timekeeping functions at the Facility.  In addition, Operator shall be entitled, to the extent permitted by applicable law and at its sole cost and expense, to make copies of any such records for purposes of litigation involving a patient or employee to whom such record refers. New Operator agrees to maintain such books, records and other material relating to the Facility operations prior to the Closing Date, including, but not limited to, patient records and records of patient funds, in the manner required by law, at the Operators sole cost and expense.  Notwithstanding anything to the contrary contained herein, to the extent New Operator makes any employee or staff member available to Operator for any reason, pursuant to this Section 11, Operator shall reimburse New Operator, for all expenses including the wages and benefits of any such employee.

(D)     New Operator agrees to notify Operator within three (3) business days of receipt by New Operator or the Facility of any request for medical records, notice of intent to commence litigation, summons, writs, complaints or other form of claim or litigation which either alleges acts or omissions on the part of Operator which occurred prior to the Closing Date or which identifies Operator or its affiliates, employees, officers or directors as a party or which relates to any of the Facility records retained by Operator. All such notices shall be sent to Operator at the address set forth in Section 26.

(E)     New Operator agrees to take reasonable steps to safeguard, maintain and preserve all Facility Records transferred under this Transfer Agreement in accordance with the provisions of, and for the periods prescribed by all applicable laws and regulations.  New Operator shall not be liable to Operator in the event that the same are destroyed by fire, flood or other event or occurrence unless such loss was due to the negligence of the New Operator.

54580075.2

**EXHIBIT A**

12.   Facility Supplies.  On the Closing Date, Operator agrees to transfer to New Operator and New Operator accepts and assumes from Operator all of Operator's right, title and interest in and to Inventory as required in Section 2(A)(vii).

13.   Assignment and Assumption of Contracts and Leases.

(A)   In connection with the transfer of the operations of the Facility to New Operator by Operator, New Operator shall only accept and assume the contracts and leases set forth on Schedule 13, which Schedule 13 shall be provided by New Operator by the later of fifteen (15) business days from the date the contracts are provided (via VDR or delivery to New Operator) or fifteen (15) business days after the Effective Date ("**Assumed Contracts**"), excluding, however, any and all amounts due, rights, claims or responsibilities thereunder existing and relating to the period of time prior to the Closing Date. If a contract is not listed on Schedule 13, such agreement shall not be deemed transferred to New Operator. New Operator acknowledges and agrees that it has been advised by Operator that it has no right to assume the Master Operating Contracts, and such contracts will not be provided or made available in the VDR. "**Master Operating Contracts**" shall mean any contract in the name of Golden Living, Operator or any affiliate thereof, which covers equipment located at, or services provided to, the Facility as well as other facilities operated by Operator's affiliates (and shall include, without limitation, private health insurance and managed care payor contracts). The Parties shall cooperate to obtain any consents of any Parties necessary to permit the assignment of the Assumed Contracts.  Operator and New Operator acknowledge that certain of the Assumed Contracts may not, by their terms, be assignable; and, accordingly, none of such non-assignable Assumed Contracts shall be deemed assigned to or assumed by New Operator unless and until the same shall become so assignable.  If and when any necessary consent shall be obtained or any such Assumed Contract shall otherwise become assignable, Operator shall take all necessary action to assign all of its rights and obligations thereunder to New Operator and New Operator shall, without the payment of any pre-Closing liabilities or further consideration therefore, assume such rights and obligations for the period of time beginning after the Closing Date.  Until such time as the Assumed Contracts are assigned to New Operator, Operator shall not enter into any amendments of such non-assignable Assumed Contracts without the prior written consent of New Operator. Until such time as the non-assignable Assumed Contracts are assumed by New Operator, (i) New Operator shall perform and discharge fully all of the obligations of Operator under any of such non-assignable Assumed Contracts to the extent the same would have constituted assumed liabilities if the Assumed Contracts had been assumed by New Operator as of the Closing Date and to the extent the same relate to the period of time on and after the Closing Date and to the extent the same relate to the period of time on and after the Closing Date, and New Operator shall indemnify, hold harmless, protect and defend Operator, and its respective officers, employees, managers and members, from and against any and all damages, demands, costs, expenses and liabilities arising out of New Operator's failure to make payments or perform any other obligations which relate to the period of time on and after the Closing Date occurring under the Assumed Contracts or non-assignable Assumed Contracts on and after the Closing Date, and (ii) Operator shall, without further consideration therefore, pay, assign and remit to New Operator promptly all monies, received, or which may be received or obtained in respect of the non-assignable Assumed Contracts related to periods commencing on the Closing Date and Operator shall take such reasonable actions as shall be necessary to confer on New Operator any other benefits that may be available under such non-assignable Assumed Contracts.

14

**EXHIBIT A**

(B)     New Operator agrees to meet with Aegis Therapies, Inc., Alixa RX  LLC  and Alixa RX Consulting LLC (each of which, as of the Effective Date, is an affiliate of Operator), and evaluate their respective services and proposals for the provision of therapy services by Aegis Therapies, Inc. and pharmacy and pharmacy consulting services by Alixa RX LLC and Alixa RX Consulting LLC, respectively.  Notwithstanding anything to the contrary contained herein, in no event shall New Operator be obligated to enter into any agreement whatsoever with any of Aegis Therapies, Inc.,  Alixa RX  LLC  or Alixa RX Consulting LLC.

14.     <u>Representations and Warranties</u>.

14.1    <u>Operator's Representations and Warranties</u>. In order to induce New Operator to enter into this Transfer Agreement, Operator represents and warrants to New Operator as follows:

(A)     Operator is a limited liability company duly formed, validly existing and in good standing under the laws of the state of its formation and duly qualified to do business in the State, and has all requisite power and authority to own, lease, operate and transfer the Assets to which it holds title and to own property and carry on its business as now being conducted.

(B)     Subject to Operator securing the Operator Consents and to New Operator securing the Regulatory Approvals, (i) Operator has all requisite power and authority to execute and deliver this Transfer Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, (ii) the execution and delivery of this Transfer Agreement by Operator, the performance of this Transfer Agreement by Operator, and the consummation of the transactions contemplated hereby have been duly authorized by the governing body of Operator and no other corporate proceeding on the part of Operator is necessary to authorize this Transfer Agreement or to consummate the transactions contemplated hereby, and (iii) this Transfer Agreement has been duly executed and delivered by Operator and constitutes the valid and binding obligation of Operator, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and general principles of equity. Operator represents that, to the best of its actual knowledge, none of the facilities are facing bankruptcy, insolvency, reorganization or any other type of moratorium on the rights of creditors generally.

(C)     Subject to Operator securing the Operator Consents and to New Operator securing the Regulatory Approvals, the execution and delivery of this Transfer Agreement by Operator does not, and the performance of this Transfer Agreement by Operator and the consummation of the transactions contemplated hereby will not, conflict with or violate or constitute, with or without notice or the lapse of time or both, a breach of or default under, (i) the corporate charter documents of Operator, (ii) any provision of United States federal, state, local or foreign law, statute, ordinance, rule, regulation, order, writ, judgment, injunction, decree, determination, or award of any court, Governmental Entity or instrumentality, (iii) any franchise, mortgage, deed of trust, indenture, or agreement except the security for any senior financing of Operator which will be released at Closing, or (iv) any other instrument to which Operator is a party or by which any of the foregoing may be bound or to which Operator or any portion of the Assets are subject.

(D)     Subject to Operator securing the Operator Consents and to New Operator securing the

54580075.2

**EXHIBIT A**

Regulatory Approvals, (i) the execution and delivery of this Transfer Agreement by Operator does not, and the performance of this Transfer Agreement by Operator and the consummation of the transactions contemplated hereby will not, with or without notice or the lapse of time or both, give to others any rights of termination, amendment, acceleration or cancellation of, or require payment under, or result in the creation of any lien, charge, encumbrance, security interest, mortgage, pledge, claim, option, lease, license, easement, liability or restriction of any kind whatsoever, direct or indirect, whether accrued, absolute, contingent or otherwise (collectively "**Liens**," which excludes those Permitted Liens set forth in Schedule 14.1(D)), or adversely affect any of the Assets, and (ii) without limiting the generality of the foregoing, the execution and/or performance of this Transfer Agreement will not, with or without the giving of notice or the passage of time or both, create a right to accelerate or loss of rights under, or result in, cause or create any liability, negative reassessment or revaluation of any material assets or have any negative effect upon the value of the Assets.

(E)     The execution and delivery of this Transfer Agreement by Operator does not, and the performance by Operator of this Transfer Agreement and the consummation of the transactions contemplated hereby except as otherwise contemplated herein, will not require Operator to obtain any consent, waiver, approval, authorization or permit of, or to make any filing with or notification to any person, any court, administrative agency or commission or other governmental or quasi-governmental entity, authority or instrumentality, whether foreign or domestic (a "**Governmental Entity**"), or any third party other than such consents, waiver, approval, authorization, permit or filing which Operator is required to make or secure prior to the Closing Date (including, without limitation, consents to assignment of contracts and leases, the "**Operator Consents**").

(F)     Prior to the date hereof, Operator has delivered or otherwise made available in the VDR to New Operator copies of the unaudited balance sheets of the Facility for the years ending December 31, 2014, and December 31, 2015, and statements of income for the years then ended, and Operator has delivered copies of an unaudited interim balance sheet of the Facility at June 30, 2016, and statements of income with respect to the Facility for the six (6) month period then ended (collectively, the "**Facility Financial Statements**"). To the actual knowledge of Operator's Senior Executives, except as set forth on Schedule 14.1(F), the Facility Financial Statements present fairly and accurately in all material respects the financial condition of the Facility and the results of operation of the Facility at the dates and for the periods indicated consistent with Operator's past practices in preparing financial statements.

(G)     To the actual knowledge of Operator's Senior Executives, except as set forth in Schedule 14.1(G), since June 30, 2016, there has not been any Material Adverse Change.

(H)     To the actual knowledge of Operator's Senior Executives, no current officer, director or managing employee (as that term is defined in 42 U.S.C. §1320a-5(b)) of Operator has been (i) excluded from participating in the Medicare program or any other applicable government reimbursement program, (ii) subject to sanction pursuant to 42 U.S.C. §§1320a-7a or 1320a-8, or (iii) convicted of a criminal offense under the Anti-Kickback Statute (42 U.S.C. §1320a-7b).

(I)     All foreign, federal, state and local tax returns required to be filed by or on behalf of

**EXHIBIT A**

Operator with respect to the operations of the Facility have been filed within the time period and in the manner prescribed by law, except where any non-compliance would not result in any Material Adverse Change. To the actual knowledge of Operator's Senior Executives, all such returns filed for the three (3) preceding years accurately reflect all material liability for taxes required to be paid in connection with Operator's operation of the Facility for the periods covered thereby. All taxes owed in connection with the operations of the Facility or the ownership, use or operation of the Facility or Assets have been paid in full or appropriate provision for payment has been made through the date hereof. Operator currently has no outstanding tax liability under the law of any jurisdiction that would subject New Operator or the Assets to liability or withholding requirements, as to any liability of Operator, under such jurisdiction's law. To the actual knowledge of Operator's Senior Executives, there is no pending examination or proceeding by any authority or agency with respect to Operator which would have a Material Adverse Change on the Facility and relating to the assessment or collection of any taxes with respect to the Facility.

(J)     Prior to the date hereof, Operator has delivered or otherwise made available in the VDR to New Operator copies of the current loss run reports for each of the Operator Insurance Policies through June 30, 2016 (the "**Loss Run Reports**"). To the actual knowledge of Operator's Senior Executives, the matters listed on the Loss Run reports, or otherwise disclosed in the VDR, include all material existing, pending or threatened suits, actions, proceedings, inquiries, enforcement actions, investigations, claims or demands (including notices of intent to file a claim), or legal, administrative, arbitration or other method of settling legal disputes under the Operator Insurance Policies ("**Pending Litigation**"). To the Knowledge of Operator's Senior Executives, except as set forth in the Loss Run Reports or on Schedule 14.1(**J**), no event has occurred or circumstance exists that is reasonably likely to give rise to any material action or proceeding related to the Facility.

(K)     To the actual knowledge of Operator's Senior Executives, Operator has been issued, and is in good standing with respect to, any and all material licenses and permits required for the operation of the Facility. The nursing home license (e.g., Skilled NSG FAC/NSG FAC Dual Cert) and CLIA (Clinical Laboratory Improvement Amendment of 1988) certificates have been provided to New Operator or made available in the VDR. Operator has all material licenses, certificates of need, permits and franchises required by law or governmental regulations from all applicable federal, state and local authorities and any other regulatory agencies necessary or proper in order to own and/or lease the Assets and to conduct and operate the Facility.

(L)     To the actual knowledge of Operator's Senior Executives, (i) no notice from any authority in respect to the threatened, pending or possible revocation, termination, suspension or limitation of or the assessment of any fines or penalties under the licenses or permits has been issued or given, nor is Operator aware of the proposed or threatened issuance of any such notice, and (ii) Operator's operation of the Facility is in substantial compliance in all material respects with the applicable provisions of nursing facility laws, rules, regulations and published interpretations to which Facility is subject (including applicable health care laws, rules and regulations relating to the payment or receipt of illegal remuneration including 42 U.S.C. §1320a-7b(b) [the Medicare/Medicaid anti-

**EXHIBIT A**

kickback statute], 42 U.S.C. §1395nn [the Stark Statute], 42 U.S.C. §1320a-71, 42 U.S.C. §1320a-7b(a), 42 U.S.C. §1320a-7b(c), and any applicable State law governing kickbacks and matters similar to such federal statutes).

(M)    At any time, and from time to time on or prior to the Closing Date, Operator may supplement or amend the schedules and/or information in the VDR (collectively, a "**Disclosure Update**"). The representations, warranties, and schedules will be deemed supplemented and amended by any Disclosure Update in order to cause the representations and warranties of Operator to be true as of the Effective Date and the Closing Date and, accordingly, New Operator and any Asserting Party shall be barred from seeking indemnity with respect to any prior and updated versions of the schedules and/or VDR.

Notwithstanding anything to the contrary contained herein, Sections 14.1(G)-(L) are qualified to exclude any state survey deficiencies so long as true and correct copies of such state surveys have been provided to New Operator or otherwise made available in the VDR, and such deficiencies are not likely to result in the imminent suspension, revocation, or impairment of the Facility or its operations.

14.2    New Operator Representations and Warranties. New Operator hereby represents and warrants to Operator as follows:

(A)    New Operator is a limited liability company duly formed, validly existing and in good standing under the laws of the State of its formation and is, or prior to Closing will be, duly qualified to do business in the State.

(B)    This Transfer Agreement has been duly executed and delivered by New Operator, and, subject to New Operator obtaining the Regulatory Approvals, no other act or proceeding on the part of New Operator is necessary to authorize this Transfer Agreement or the transactions contemplated hereby.  This Transfer Agreement represents a valid and binding obligation of New Operator, enforceable against New Operator in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

(C)    Neither the execution and delivery by New Operator of this Transfer Agreement, nor the performance of its obligations contemplated herein, will (i) violate, or be in conflict with, or constitute a default (or an event or condition that, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or cause the acceleration of the maturity of any of debt, liability, contract, agreement or other arrangement to which New Operator is subject or (ii) subject to New Operator obtaining the Regulatory Approvals, violate any federal, state, or local statute, law, rule, regulation, judgment, decree, order, writ or injunction of any court or Governmental Entity to which New Operator is subject.

(D)    New Operator has no knowledge of any existing event, matter or situation or any pending or threatened litigation or event, happening or occurrence, which would prevent or materially and adversely impair New Operator's ability to obtain the Regulatory Approvals.  New Operator has not been denied licensure of a nursing home in any state.

54580075.2

**EXHIBIT A**

(E)     New Operator has not been induced by and New Operator has not relied upon any representations, warranties or statements, whether express or implied, made by Operator or any of Operator's representatives that are not expressly set forth in Section 14.1 (including the Disclosure Schedules), whether or not any such representations, warranties or statements were made in writing or orally.  New Operator represents and warrants that neither Operator nor any of any Operator's representatives have made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Assets, the operations of the Facility or the transactions contemplated hereby except for the representations and warranties expressly set forth in Section 14.1, and, except for the representations and warranties expressly set forth in this Section 14.1, neither any Operator nor any of its representatives will have or be subject to any liability to New Operator or any other third party resulting from the distribution to New Operator or its representatives, or the use by New Operator or its representatives, of any information, including the information located in the VDR, or any other document or information in any form provided to New Operator or its representatives in connection with the transactions contemplated hereby. New Operator acknowledges that it has conducted, to its satisfaction, its own independent investigation of Operator, the Facility and its operations, including the review of materials located in the VDR and, in making the determination to proceed with the transactions contemplated hereby, New Operator has relied on the results of its own independent investigation.

15.     Pre-Closing Covenants.

(A)     From and after the date hereof and pending the Closing Date unless New Operator shall otherwise consent in writing, which consent shall not be unreasonably withheld, Operator shall (i) maintain and operate the Assets and the Facility only in the ordinary and usual course of business diligently and in good faith, consistent with past practice; (ii) maintain the Facility's licensure status in substantial compliance with all applicable laws, rules and regulations; (iii) maintain all existing policies of insurance (or comparable policies) of or relating to the Assets and the Facility in full force and effect; (iv) use its commercially reasonable efforts to preserve Operator's existing relationships with suppliers, distributors, customers and others having business relations with Operator such that the Facility will not be impaired; (v) maintain, repair and replace the real property and the equipment  consistent with past practice; (vi) use its commercially reasonable efforts to keep available the services of the employees of Operator involved in the day to day operation of the Facility; (vii) use its commercially reasonable efforts to maintain the quality of care provided to residents; (viii) replace inventory, supplies and equipment, consistent with past practice; (ix) market, invoice and collect revenue; (x) use its commercially reasonable efforts to maintain resident census; and (xi) otherwise operate the Facility so as not to cause a breach of any covenant or warranty contained in this Transfer Agreement.

(B)     Operator shall confer with New Operator or its designee upon request of New Operator to keep it informed with respect to operational matters of a material nature and to report the general status of the ongoing operations of the Facility.  In no event shall New Operator be deemed to or have responsibility as the operator and the Operator shall keep all final decision-making authority which it shall exercise in a manner consistent herewith.

(C)     Operator shall provide New Operator and its employees, accountants, consultants, legal counsel, agents and other authorized representatives reasonable access to the Facility and to the books and records of Operator related to the Facility for the purpose of making

54580075.2

**EXHIBIT A**

such investigations concerning the affairs of the Assets and the Facility as New Operator may reasonably desire, and Operator shall promptly furnish New Operator such information as New Operator may from time to time reasonably require with respect to the Assets and/or the Facility. All of such access rights shall be exercised in coordination with the individuals designated by Operator and shall be exercised solely during regular business hours and upon reasonable notice to Operator. In furtherance of the foregoing but subject to such limitations as Operator may deem to be necessary and appropriate in order to minimize the disruption to the operations at the Facility, Operator shall cause the employees of Operator to assist New Operator in making any such investigation and shall cause the counsel, accountants, consultants, and other non-employee representatives of Operator to be reasonably available to New Operator for such purposes. Without limiting the foregoing, Operator shall upon request but subject to such limitations as Operator may deem to be necessary and appropriate in order to minimize the disruption to the operations at the Facility, (i) permit interviews of such employees as New Operator reasonably designates, (ii) permit New Operator to conduct on-site due diligence investigations of Operator's properties and facilities that comprise the Facility; and (iii) assist New Operator in contacting and arranging meetings with such suppliers of Operator as New Operator may reasonably request; provided, however, that representatives of Operator may, at their option, participate in any such meetings.

(D) No Party shall issue any public announcement, report, statement or press release or otherwise make any public statement regarding this Transfer Agreement or the transactions contemplated hereby without the prior written consent of the other Parties, except as otherwise required by law. No announcement by Operator to its employees or any union representing same shall be a breach of this covenant.

(E) Operator shall cooperate, at no cost or expense (other than the expenditure of the reasonable time needed for Operator to make its historical MDS data available to New Operator, but not the expenditure of any additional time that may be required for the MDS data to be incorporated into New Operator's computer systems) to Operator, with New Operator to transfer all MDS data on its computer hardware and software systems to New Operator's computer hardware and software systems at a time mutually acceptable to both Parties, but with the goal of having a seamless transition of MDS data to permit the continued uninterrupted provision of health care to the residents of the Facility. Except as specifically provided for in the first sentence of this Section 15(E), if and to the extent there is any cost to Operator of the transfer of data contemplated by this Section 15(E), the same shall be reimbursed to Operator by New Operator.

(F) Operator maintains professional and general liability coverage with a limit of at least One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) in the aggregate (the "**Professional and General Liability Coverage**"), and, if such Professional and General Liability Coverage is cancelled or terminated, Operator shall purchase an extended reporting period endorsement to such Professional and General Liability Coverage (the "**Tail Coverage**") and, to the extent reasonably attainable without additional cost, name New Operator as an additional insured to such Tail Coverage. The combination of the Professional and General Liability Coverage and Tail Coverage, if any, shall extend the claims reporting period for purpose of such professional and general liability coverage for three (3) years from and after the Closing Date.

16. Closing Matters. Upon the terms and subject to the conditions set forth in this Transfer Agreement, on the Closing Date:

54580075.2

**EXHIBIT A**

(A)     Operator shall deliver to New Operator assignment instruments, and other instruments of transfer and conveyance as shall be reasonable or necessary to convey, transfer, assign and deliver the Assets to New Operator or its designee pursuant to the terms of this Transfer Agreement including, but not limited to, the Bill of Sale and the Assignment and Assumption Agreement in the forms attached hereto as Exhibit 16(A)-1 (the "**Bill of Sale**") and Exhibit 16(A)-2 (the "**Contracts Assignment and Assumption Agreement**"), which shall be duly executed by the Operator;

(B)     Both Parties hereto shall execute and deliver to the other a Bring Down Certificate in the form attached hereto as Exhibit 16(B);

(C)     Operator shall deliver, to the extent that they are not posted at the Facility, certificates, licenses, permits, authorizations and/or approvals issued for or with respect to the Facility by any Governmental Entities having jurisdiction;

(D)     Operator shall deliver the original of a letter executed by Operator or by its agent advising residents of the transfer of the operations to New Operator and, if applicable, directing that future payments for services and occupancy be tendered to New Operator;

(E)     New Operator will deliver a counterpart copy of the Contracts Assignment and Assumption Agreement;

(F)     New Operator and Operator shall execute a closing statement with respect to the prorations contemplated by Section 7 hereof, and the Party owing pursuant to such statement shall pay the amount due in good funds at Closing;

(G)     Operator will provide New Operator with a list of the names, positions, and annual salaries or wage rates and bonus and other compensation arrangements as of the date reasonably closest to the Closing Date of the Transferred Employees;

(H)     Operator shall provide the Patient Trust Fund Schedule to New Operator;

(I)      Operator shall provide New Operator with a reasonably detailed schedule showing the Private A/R and Third Party Payor A/R which are outstanding as of the Closing Date;

(J)     Unless waived by Operator, New Operator and the appropriate affiliates of the     Parties shall execute and deliver the Master Lease and Assignments; and

(K)     Unless waived by Operator, affiliates of the Parties shall execute and deliver the Other Operations Transfer Agreements and, except as set forth in Section 18(F),     any documents necessary to consummate the transactions referenced therein.

(L)     New Operator Guarantor shall execute and deliver to the Operator Guaranty as set forth in Exhibit 33 hereof.

(M)     Operator Guarantor shall execute and deliver to the New Operator Guaranty as set forth in Exhibit 34 hereof.

54580075.2

**EXHIBIT A**

17. <u>Survival and Indemnification.</u>

(A)    Except as specifically set forth in this Agreement, the representations, warranties and covenants contained in this Transfer Agreement, and in any agreements, certificates or other instruments delivered pursuant hereto, shall not survive the Closing hereunder and the consummation of the transactions contemplated hereby.

(B)    Operator shall defend, indemnify and hold New Operator and New Operator's shareholders, members, officers, directors, employees, representatives and agents harmless against and reimburse the foregoing parties on demand for, any claim, action, suit, proceeding, investigation, liability, damage, loss, cost or expense (including reasonable attorneys' fees and reasonable disbursements of counsel and actual costs) (collectively, a "**_Loss_**") resulting from (i) a breach by Operator of its obligations under this Transfer Agreement which is not cured within thirty (30) days after receipt of written notice from New Operator setting forth, in reasonable detail, the nature of such breach, (ii) any demands for repayment of overpayments or payment of civil monetary penalties in connection with Medicare or Medicaid matters, and any withholding from payments otherwise due to New Operator by Medicare or Medicaid for goods sold or services rendered from and after the Closing Date as a result of a determination by Medicare or Medicaid that, as a result of an audit or a denial of a claim, Operator has been overpaid or has otherwise received payment(s) to which it was not entitled for goods sold or services rendered prior to the Closing Date (a "**Recoupment**"), and (iii) the Excluded Liabilities, including, without limitation, any claim, demand or litigation by a current or former employee, resident, vendor or any other private entity (as compared to governmental) that names New Operator alone or in conjunction with Operator and is based solely on the acts or omissions of Operator in connection with the operation of the Facility prior to the Closing Date.  For the avoidance of doubt, "Loss" shall be limited to actual out-of-pocket expenses and costs incurred by New Operator (or Operator on New Operator's behalf), (i) that, for purposes of <u>clause (iii)</u>, are the result of a claim, demand or litigation by a third party, and (ii) shall not include any claims alleging that New Operator's management and/or operation of the Facility on or following the Closing Date has been adversely affected by Operator's management and/or operation of the Facility prior to the Closing Date or by the condition in which the Facility was delivered to New Operator as of the Closing Date..

(C)    New Operator shall defend, indemnify and hold Operator and Operator's shareholders, members, officers, directors, employees, representatives and agents, and their respective representatives, heirs and assigns, harmless against, and reimburse the foregoing parties on demand for, any Loss incurred by the foregoing parties as a result of (i) a breach by New Operator of its obligations under this Transfer Agreement which is not cured within thirty (30) days after receipt of written notice from Operator setting forth in reasonable detail the nature of such breach; (ii) the occupancy or operation of the Facility by New Operator from and after the Closing Date; (iii) any acts, omissions, elder abuse or negligence of New Operator or any person claiming under New Operator, or the contractors, agents, employees, invitees or visitors of New Operator with respect to the Facility and its patients and residents from and after the Closing Date; (iv) any employment claims made against Operator for employment issues occurring from and after the Closing Date; (v) any failure by New Operator to pay any liabilities in connection with the Facility attributable to the period from and after the Closing Date; (vi) any failure by New Operator to pay or perform any obligations or liabilities assumed by New Operator pursuant to this Transfer Agreement including, but not limited to, under

**EXHIBIT A**

the Assumed Contracts for any period after the Closing Date; (vii) New Operator's billing under Operator's Medicare provider agreement or, as applicable, Operator's other provider agreements or numbers; and (viii) the Assumed Liabilities.

(D)     A Party claiming indemnification under this Section 17 ("**Asserting Party**") must promptly notify in writing the Party from which indemnification is sought ("**Defending Party**") of the nature and basis of such claim for indemnification.  If such claim relates to a claim, litigation or other action by a third party against the Asserting Party, or any fixed or contingent liability to a third party ("**Third Party Claim**"), the Defending Party may elect to assume the defense of the Third Party Claim within a reasonable time after receipt of the notice referred to above at its own expense with counsel selected by the Defending Party and reasonably satisfactory to the Asserting Party.  The Defending Party may not assume the defense if the named parties to the Third Party Claim (including any impleaded parties) include both the Defending Party and the Asserting Party and representation of both Parties by the same counsel would be inappropriate due to actual or potential differing interests between them, in which case the Asserting Party shall have the right to employ counsel reasonably satisfactory to the Defending Party at the expense of the Defending Party.  If the Defending Party assumes the defense of the Third Party Claim, the Defending Party shall not be liable for any fees and expenses of counsel for the Asserting Party incurred thereafter in connection with the Third Party Claim.

(E)     (i)     **EXCEPT AS SUCH MAY BE PART OF ANY CLAIM OF ANY THIRD PARTY, UNDER NO CIRCUMSTANCES SHALL OPERATOR, NEW OPERATOR OR ANY AFFILIATE THEREOF BE RESPONSIBLE OR LIABLE IN ANY WAY FOR INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES, DIMINUTION IN VALUE, OR ANY EXEMPLARY DAMAGES, REGARDLESS OF WHETHER THE ACTION IS FOUNDED IN CONTRACT, TORT, STATUTORY OR OTHERWISE, AND BOTH PARTIES AGREE THAT IN NO EVENT SHALL EITHER ASSERT, CLAIM, DEMAND OR OTHERWISE REQUEST SUCH DAMAGES.**

(ii)     For the avoidance of doubt, no individual officer, director, member, managing member, shareholder, equity holder, partner, employee, agent, or representative of either Party shall have any liability for any claims of the other Party related to this Transfer Agreement, or any agreements, certificates or instruments delivered in connection herewith, in any way.

(iii)     Neither Operator nor New Operator shall have any liability to any Asserting Party with respect to Losses arising out of any of the matters referred to in this Section until such time as the amount of such liability post-Closing shall exceed Forty Thousand Dollars ($40,000) (the "*Deductible*") in the aggregate, and once met, the Defending Party shall be responsible for those amounts in excess of the Deductible.  The maximum aggregate liability of Operator and New Operator for indemnity payments under this Section shall be an amount equal to Two Hundred Thousand Dollars ($200,000) (the "*Cap*") paid and/or payable pursuant to this Section.  For the avoidance of doubt, the Deductible and the Cap shall apply to representations, warranties, and general breaches, but shall not apply to amounts due in connection with Sections 2E, 7, and 8.

(iv)     The remedies provided in this Section 17 shall be the sole and exclusive remedies post-Closing that may be available to a Party or an Asserting Party with respect to any matters arising under or relating to this Transfer Agreement, any document executed and delivered pursuant to the provisions hereof and the transactions contemplated herein.

54580075.2

**EXHIBIT A**

(v)     No Party shall be required to indemnify the other with respect to any Losses for which third party recoveries or insurance proceeds are paid to the Asserting Party, regardless of the identity of the holder of such insurance policy or benefit; *provided, however*, that if the insurance proceeds or third party recoveries do not satisfy the entire amount of the Losses, then the provisions of this Section shall be applicable to such unsatisfied portion.  In determining the amount of any Losses suffered by a Party under this Agreement, the net tax benefit to a Party of any reduction in income taxes or other taxes for allowable deductions for such Losses shall be taken into consideration.  In the event of a claim under this Section, a Party shall have a duty to mitigate its Losses.

(F)     Consistent with Section 17(A), neither Party shall have any liability under this Transfer Agreement or otherwise to the other Party for any claims asserted after the end of the applicable Survival Period, as follows:  (i) for a breach of the representations and warranties, and the pre-closing covenants and obligations, contained in this Transfer Agreement, and in any agreements, certificates or other instruments delivered pursuant hereto, shall survive Closing for the period of one (1) year after the Closing Date; and (ii) post-closing covenants and obligations shall survive for the periods as follows:  (a) for claims related to Excluded Liabilities, and claims related to Recoupments or misdirected funds, three (3) years after the Closing Date, and (b) any other claim under this Transfer Agreement, including without limitation non-monetary obligations for access and/or retention of records, confidentiality, general cooperation, and further assurances, the relevant statute of limitations (subsections (i), (ii)(a), and (ii)(b) each being a "***Survival Period***").  To the extent that a claim is asserted in writing within the applicable Survival Period, the Party asserting the claim shall have thirty (30) days after the end of the Survival Period to institute formal litigation, in which event the specific amounts as to which the claim is asserted will survive until the full and final resolution of such claim. Notwithstanding the foregoing, no Party shall be liable for any Loss resulting from or relating to any inaccuracy in or breach of any representation, warranty, pre-Closing covenant or obligation, in this Transfer Agreement if the Party seeking indemnification for such Loss had knowledge of such inaccuracy or breach before Closing.

18.     Conditions Precedent to the Obligations of Parties.  The obligations of New Operator and Operator hereunder are subject to the fulfillment of all of the following conditions precedent unless such fulfillment is waived in writing by New Operator or Operator, as applicable:

(A)     New Operator shall have received the New License, or New Operator shall have obtained such written assurances from the Department, in form and substance reasonably acceptable to New Operator, that the New License has been or will be issued by the Department to New Operator effective as of the Closing Date.

(B)     The representations and warranties of New Operator and Operator contained in this Transfer Agreement shall be true and correct in all material respects as of the Closing Date as though made on and as of such date.

(C)     No injunction, temporary restraining order, judgment or other order of any court or Governmental Entity or instrumentality shall have issued or have been entered which would be violated by the consummation of the transactions contemplated hereby.

(D)     New Operator and Operator shall have performed and complied, in all material respects, with all terms, agreements, covenants and conditions of this Transfer Agreement to be performed or complied with by them at or prior to the Closing.

54580075.2

**EXHIBIT A**

(E)     Unless waived by Operator, affiliates of New Operator and Operator shall have executed and exchanged the Master Lease and Assignments.

(F)     Unless waived by Operator, the affiliates of the Parties shall have consummated the transactions contemplated by the Other Operations Transfer Agreements (except for any Other Operation Transfer Agreements where the New License condition under the equivalent of Section 18(A) has not yet been satisfied or waived).

19.     Binding Effect.   Neither Party may assign its rights or obligations under this Transfer Agreement without the consent of the other party which consent, in the case of a proposed assignment by New Operator, may be withheld in the sole and absolute discretion of Operator; provided, however, in the event of a proposed assignment of New Operator's rights or obligations under this Transfer Agreement to a wholly-owned or controlled affiliate of New Operator, Operator shall not unreasonably withhold, delay or condition such consent. Notwithstanding the foregoing, New Operator acknowledges and agrees that Operator may collaterally assign this Transfer Agreement as security to any lender providing financing to Operator or any affiliate of Operator. Subject to the foregoing limitation on assignment, this Transfer Agreement shall be binding on and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

20.     Applicable Law; Consent to Jurisdiction.   This Transfer Agreement shall be governed by and construed in accordance with the laws and judicial decisions of the State.  Operator and New Operator hereby consent to jurisdiction of the courts of the State and, without limiting the generality of the foregoing, to the venue of such courts in the county in which the Facility is located.

21.     Counterpart Execution; Electronic Transmissions.   This Transfer Agreement, and any amendments thereto or deliverables in connection therewith, may be executed in any number of counterparts with the same effect as if the Parties hereto had signed the same document. All counterparts will be construed together and shall constitute one agreement.  Signatures transmitted by facsimile, electronic mail or other electronic transmission shall have the same effect as original signatures.

22.     Amendments.   This Transfer Agreement may not be amended or modified except by written instrument signed by the Parties hereto nor may any provision be waived except by written instrument signed by the Party granting the waiver.

23.     Expenses.   Except as provided in this Transfer Agreement, each Party shall bear its own costs and expenses incurred in connection with this Transfer Agreement and the transaction contemplated hereby.

24.     Construction.   If an ambiguity or question of intent or interpretation arises under this Transfer Agreement, this Transfer Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Transfer Agreement.

25.     Waiver of Jury Trial.  EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION BROUGHT ON OR WITH RESPECT TO THIS TRANSFER AGREEMENT, INCLUDING TO ENFORCE OR DEFEND ANY RIGHTS HEREUNDER, AND AGREES THAT ANY SUCH ACTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

**EXHIBIT A**

26.   Notices.  The delivery of any notice or communication required or permitted hereunder shall be in writing.  The delivery of such notices or communications, shall be made by fax (and if by fax, then also by another method hereunder as well), by regular mail or overnight courier to the individuals at addresses indicated below:

If to New Operator:

c/o Skyline Healthcare
505 Marlboro Road
Wood-Ridge, NJ 07075
Attn: Kenneth Nichols, Chief Development Officer, and Louis Schwartz, VP Mergers & Acquisitions
Telecopier: (501) 508-4267

With a copy to:

Allen V. Koss, Esq.
Koss & Schonfeld, LLP
90 John Street – Suite 408
New York, New York 10038
Telecopier: (212) 401-4757

If to Operator:

c/o Golden Living
1000 Fianna Way
Fort Smith, AR  72919
Attn: Holly Rasmussen-Jones
Director, Transactions
Telecopier: (479) 201-4801

With a copy to:

Nicholas Finn
Senior Vice President-Corporate Development
Four Embarcadero Center, Suite 710
San Francisco, CA  94111

With a copy to:

Polsinelli PC
100 S. Fourth Street, Suite 1000
St. Louis, MO 63102
Attention: Bobby Guy, Esq.; Andrew J. Voss, Esq., and Travis F. Jackson, Esq.
Telecopier: (314) 480-7049

27.   Entire Agreement.  This Transfer Agreement constitutes the entire agreement between the Parties regarding the matters provided herein and supersedes all prior negotiations, documents or writings with respect thereto.  There are no other written statements, promises, or representations made by the Parties that are intended to alter, modify or complement this Transfer Agreement. Further, while the entry of the Master Lease and Assignments and the Other Operations Transfer Agreements are conditions to Closing, the Parties agree that the Master Lease and Assignments, the Other Operations Transfer Agreements, and this Transfer Agreement are intended to be separate and independent agreements between separate parties and not otherwise related or integrated together in any way.

28.   Further Assurances.  Each of the Parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Transfer Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other Party to perfect or evidence their rights hereunder.

29.   Joint Venture; Third Party Beneficiaries.  Nothing contained herein shall be construed as forming a joint venture or partnership between the Parties hereto with respect to the subject matter hereof.

54580075.2

**EXHIBIT A**

30.   <u>Captions</u>.  The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

31.   <u>Partial Invalidity</u>.  Whenever possible, each provision of this Transfer Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained in this Transfer Agreement shall, for any reason, be held to be invalid, illegal or unenforceable, this Transfer Agreement shall be construed as if such illegal or unenforceable provision or provisions had never been contained in this Transfer Agreement unless the deletion of such provision or provisions would result in such a material change as to cause completion of the transactions contemplated hereby to be unreasonable.

32.   <u>Disclosure Schedules</u>.   The information contained in the Disclosure Schedules shall be deemed to qualify to the specific Section (or subsection, as appropriate) of this Transfer Agreement to which it corresponds, and shall be cumulative so that if the existence of the fact or item or its contents disclosed in any particular schedule is relevant to any other schedule, then such fact or item shall be deemed to be disclosed with respect to the other schedule whether or not a specific cross-reference appears.  The headings contained in the Disclosure Schedules are included for convenience only, and are not intended to limit the effect of the disclosures contained in such schedule or to expand the scope of the information required to be disclosed in such schedule.  Descriptions of documents in the Schedules are summaries only and are qualified in their entirety by the specific terms of such documents.  Matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Transfer Agreement to be reflected herein; additional matters are set forth for informational purposes and the fact that any item of information is disclosed in the Disclosure Schedules shall not be construed to mean that such information is required to be disclosed by this Transfer Agreement.  Any information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the term "material" or other similar terms in this Transfer Agreement or constitute an admission that such items are required to be disclosed under this Transfer Agreement.

33.   <u>New Operator Guaranty</u>.  The due and timely payment and performance of New Operator's obligations under this Transfer Agreement shall be guaranteed pursuant to the Guaranty of New Operator's obligations (the "**New Operator Guaranty**") attached hereto as <u>Exhibit 33</u>.

34.   <u>Operator Guaranty</u>.  The due and timely payment and performance of Operator's obligations under this Transfer Agreement shall be guaranteed pursuant to the Guaranty of Operator's obligations (the "**Operator Guaranty**") attached hereto as <u>Exhibit 34</u>.

35.   <u>Definitions</u>.  Capitalized terms shall have the following meanings:

"*Accounts Receivable*" shall have the meaning set forth in <u>Section 8(A)</u>.

"*Ancillary Permits and Approvals*" shall have the meaning set forth in <u>Section 4(A)</u>.

"*Asserting Party*" shall have the meaning set forth in <u>Section 17(D)</u>.

"*Assets*" shall have the meaning set forth in <u>Section 2(A)</u>.

"*Assumed Contracts*" shall have the meaning set forth in <u>Section 13(A)</u>.

"*Assumed Liabilities*" shall have the meaning set forth in <u>Section 2(E)</u>.

54580075.2

**EXHIBIT A**

"***Bill of Sale***" shall have the meaning set forth in Section 16(A).

"***Cap***" shall have the meaning set forth in Section 17(E).

"***Closing***" shall have the meaning set forth in Section 3.

"***Closing Date***" shall have the meaning set forth in Section 3.

"***CMS***" shall have the meaning set forth in Section 4(B).

"***COBRA***" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, section 4980B of the Code, Title I Part 6 of ERISA, and any similar state group health plan continuation law.

"***Contracts Assignment and Assumption Agreement***" shall have the meaning set forth in Section 16(A). "***Deductible***" shall have the meaning set forth in Section 17(D)(iii).

"***Defending Party***" shall have the meaning set forth in Section 17(D).

"***Department***" shall have the meaning set forth in Section 4(A).

"***Disclosure Update***" shall have the meaning set forth in Section 14.1(K).

"***Effective Date***" shall have the meaning set forth in the unnumbered introductory paragraph hereof.

"***Effective Time***" shall have the meaning set forth in Section 3.

"***Excluded Assets***" shall have the meaning set forth in Section 2(B).

"***Excluded Liabilities***" shall have the meaning set forth in Section 2(D).

"***Facility***" shall have the meaning set forth in the Recitals.

"***Facility Financial Statements***" shall have the meaning set forth in Section 14.1(G).

"***Facility Records***" shall have the meaning set forth in Section 11(A).

"***Governmental Entity***" shall have the meaning set forth in Section 14.1(E).

"***Guarantor***" means the Operator Guarantor or the New Operator Guarantor, as the case may be.

"***HIPAA***" shall have the meaning set forth in Section 11(B).

"***Intangibles***" shall have the meaning set forth in Section 2(A)(ii).

"***Interim Billing Period***" shall have the meaning set forth in Section 4(C).

"***Inventory***" shall have the meaning set forth in Section 2(A)(vii).

**EXHIBIT A**

"*Lease Assignments*" shall mean any real estate lease assignments or sublease agreements for third-party owned facility under the Other Operations Transfer Agreements which are not under the Master Lease.

"*Liens*" shall have the meaning set forth in Section 14(D).

"*Loss*" shall have the meaning set forth in Section 17(B).

"*Loss Run Reports*" shall have the meaning set forth in Section 14.1(J).

"*Medicaid*" shall have the meaning set forth in Section 8(A).

"*Medicare*" shall have the meaning set forth in Section 8(A).

"*Master Lease*" shall mean that certain Master Lease being entered into between New Operator and its affiliates with one or more affiliates of Operator with respect to certain facilities located in Nebraska.

"*Master Lease and Assignments*" shall mean the Master Lease and the Lease Assignments.

"*Master Operating Contracts*" shall have the meaning set forth in Section 13(A).

"*Material Adverse Change*" means any change or event, whether individually or in the aggregate, that materially and adversely impacts  the operations of the Facility, provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Material Adverse Change:  (i) any changes in general United States or global economic conditions, which changes do not affect the Facility disproportionately relative to other entities operating in Operator's industry; (ii) any changes in general economic conditions in the industry in which Operator operates, which changes do not affect the Facility disproportionately relative to other entities operating in Operator's industry; (iii) any changes in law or accounting principles; (iv) compliance with the terms of, and taking any action required by, this Transfer Agreement, or taking or not taking any actions at the request of, or with the consent of, New Operator; or (v) acts or omissions of New Operator.

"*New License*" shall have the meaning set forth in Section 4(A).

"*New Operator*" shall have the meaning set forth in the unnumbered introductory paragraph hereof.

"*New Operator Guarantor*" shall mean individually, collectively, jointly and severally, those entities set forth on Exhibit 35.

"*Operator*" shall have the meaning set forth in the unnumbered introductory paragraph hereof.

"*Operator Consents*" shall have the meaning set forth in Section 14.1(E).

"*Operator's Employees*" shall have the meaning set forth in Section 6(A)(i).

"*Operator Guarantor*" shall mean GGNSC Administrative Services, LLC.

**EXHIBIT A**

"*Other Operations Transfer Agreements*" means those certain Operations Transfer Agreements dated the same date hereof, by and between the affiliates of Operators and New Operators for the purposes of transferring the operations of facilities located in Nebraska which are referenced in the Master Lease, or the subject of a separate lease assignment or sublease agreement.

"*Party*" or "*Parties*" shall have the meaning set forth in the unnumbered introductory paragraph hereof.

"*Patient Trust Fund Schedule*" shall have the meaning set forth in Section 10.

"*Patient Trust Funds*" shall have the meaning set forth in Section 10.

"*Pending Litigation*" shall have the meaning set forth in Section 14.1(J).

"*Pending Medicaid Applicants*" shall have the meaning set forth in Section 8(D).

"*Policy and Procedure Manuals and Marketing Materials*" shall have the meaning set forth in Section 2(A)(viii).

"*Private A/R*" shall have the meaning set forth in Section 8(C).

"*Professional and General Liability Coverage*" shall have the meaning set forth in Section 15(F).

"*RAC*" shall have the meaning set forth in Section 8(H).

"*Recoupments*" shall have the meaning as set forth in Section 17(B).

"*Regulatory Approvals*" shall have the meaning set forth in Section 4(A).

"*Return Date*" shall have the meaning set forth in Section 2(A)(viii).

"*Self-Pay Payments*" shall have the meaning set forth in Section 8(C).

"*Senior Executives*" shall mean the following individuals:  the Facility Administrator and/or the Facility Executive Director, Officers (above the level of vice president and assistant officers), Members of the Board of Directors, and LLC Managers under the applicable limited liability company statute for the state of organization.

"*State*" shall have the meaning set forth in the Recitals.

"*Survival Period*" shall have the meaning set forth in Section 17(B).

"*Tail Coverage*" shall have the meaning set forth in Section 15(F).

"*Termination Date*" shall have the meaning set forth in Section 6(A)(i).

"*Third Party Claim*" shall have the meaning set forth in Section 17(D).

"*Third Party Payor A/R*" shall have the meaning set forth in Section 8(C).

54580075.2

**EXHIBIT A**

"**_Transfer Agreement_**" shall have the meaning set forth in the unnumbered introductory paragraph hereof.

"**_Transferred Employees_**" shall have the meaning set forth in Section 6(A)(ii).

"**_VDR_**" shall mean the Intralinks virtual data room, including all documents and materials posted thereto as of August 26, 2016.

[*The rest of this page is left intentionally blank; signature page to follow.*]

54580075.2

**EXHIBIT A**

IN WITNESS WHEREOF, this Operations Transfer Agreement has been executed as of the date first above written.

**OPERATOR**

**GGNSC Broken Bow LLC**

By:_____
Print:_____
Title:_____

**NEW OPERATOR**

**Broken Bow Care and Rehabilitation Center LLC**

By:_____
Print: JOSEPH SCHWARTZ
Title: MANAGER

**EXHIBIT A**

IN WITNESS WHEREOF, this Operations Transfer Agreement has been executed as of the date first above written.

**OPERATOR**

**GGNSC Broken Bow LLC**

By:_____

Print:___HOLLY RASMUSSEN JONES_____

Title:_____SECRETARY_____

**NEW OPERATOR**

**Broken Bow Care and Rehabilitation Center LLC**

By:_____

Print:_____

Title:_____

Signature Page to Operations Transfer Agreement – Golden LivingCenter –Broken Bow

**EXHIBIT A**

**EXHIBIT 16(A)-1**

**Form of Bill of Sale**

In consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, _____ ("Operator"), does hereby grant, bargain, sell, convey, assign and transfer to _____ ("New Operator") and New Operator does hereby purchase, take accept and assume, all of Operator's right, title and interest in and to, all and singular, the Assets as defined in that certain Operations Transfer Agreement dated as of _____ between Operator and New Operator (the "Transfer Agreement"), which is incorporated herein by this reference.

TO HAVE AND TO HOLD, all and singular, for New Operator's use and benefit, and Operator hereby represents and warrants to New Operator that Operator has full right, power and authority to sell the foregoing Assets and to make this Bill of Sale and that the foregoing Assets are free and clear of all liens and encumbrances except as set forth in Schedule 14(D) to the Transfer Agreement. With the exception of the representations and warranties set forth in the immediately preceding sentence, the foregoing Assets are transferred in their "AS IS, WHERE IS" condition, without any representation or warranty of any kind.

Dated this _____ day of _____, 201___.

**OPERATOR:**

_____

By:_____
        [Name], [Title]

54580075.2

**EXHIBIT A**

### EXHIBIT 16(A)-2

**Form of Assignment and Assumption of Contracts**

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (the *"Assignment"*) is made and entered into as of _____, 20--, by and between _____, a Delaware limited liability company (*"Assignor"*), and _____, a _____ limited liability company (*"Assignee"*). Capitalized terms used herein without definition shall have the meanings given to them in the Operations Transfer Agreement dated _____ by and between Assignor and Assignee (the *"Agreement"*).

### W I T N E S S E T H :

**WHEREAS,** pursuant to the Agreement, Assignor has agreed to sell, transfer, assign, and deliver to Assignee, and Assignee has agreed to accept from Assignor all existing contracts described in <u>Exhibit A</u> attached hereto and incorporated by reference herein (the *"Assumed Contracts"*); and

**WHEREAS,** pursuant to the Agreement, Assignee has agreed to accept and assume Assignor's rights, claims, and interests with respect to the Assumed Contracts, and to assume the obligations under the Assumed Contracts which relate to the period of time on and after the Closing Date.

**NOW, THEREFORE,** in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**Section 1.**    <u>**Assignment and Assumption.**</u>    Effective as of the Closing, Assignor hereby transfers, assigns, and delivers to Assignee all rights, titles, and interests of Assignor in and to the Assumed Contracts. This Assignment is made pursuant to, and shall be interpreted consistent in all respects with, the Agreement.

**Section 2.**    <u>**Assignee's Acceptance and Assumption.**</u>    Assignee hereby accepts such transfer, assignment, and delivery of the Assumed Contracts from Assignor and expressly assumes any and all rights, responsibilities, obligations, and liabilities of Assignor in connection with the Assumed Contracts which relate to the period of time on and after the Closing Date.

**Section 3.**    <u>**Appointment.**</u>    Assignor hereby irrevocably appoints Assignee, its successors and assigns, as the attorney and agent of Assignor, in Assignor's name and stead, to enforce the provisions of the Assumed Contracts.

**Section 4.**    <u>**Binding Effect.**</u>    This Assignment shall be binding on and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

**Section 5.**    <u>**Captions.**</u>    The captions of this Assignment are solely for the convenience of reference and shall not affect its interpretation.

**Section 6.**    <u>**Counterparts.**</u>    This Assignment may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**Section 7.**    <u>**Governing Law.**</u>    This Assignment shall be governed by and interpreted in

**EXHIBIT A**

accordance with the laws of the State of _____ without giving effect to its conflict of law principles.

**IN WITNESS WHEREOF,** the parties hereto have executed the Assignment as of the day and year first above written.

**ASSIGNOR:**

_____

By:_____
      [Name], [Title]


**ASSIGNEE:**

_____

By:_____
      [Name], [Title]

**EXHIBIT A**

## EXHIBIT 16(B)

### Form of Bring Down Certificate

[_____] (hereinafter referred to as "Operator/New Operator") and [_____], _____ limited liability company (hereinafter referred to as "New Operator/Operator") hereby certify that:

(i)    This Certificate is being delivered pursuant to the terms and conditions of that certain Operations Transfer Agreement dated [_____] (hereinafter referred to as the "Agreement") by and between Operator and New Operator.

(ii)    All of the representations and warranties of [Operator/New Operator] contained in the Agreement are true and correct in all material respects as of the date hereof.

**IN WITNESS WHEREOF,** the undersigned have executed this Certificate this ___ day of _____, 20--.

_____, a _____

By: _____

Name: _____

Title: _____

_____, a _____

By: _____

Name: _____

Title: _____

**EXHIBIT A**

<u>**EXHIBIT 33**</u>

**New Operator Guaranty**

As of the ___ day of _____, 20__, by their signatures set forth below, _____ (individually and collectively as the context may require, the "***Guarantor***") hereby agree to absolutely and unconditionally guarantee, on a joint and several basis, the full and complete payment and performance by _____, a _____ ("***New Operator***") of all of its obligations under the Operations Transfer Agreement dated as of _____ (the "***OTA***") by and between New Operator and _____, a _____ ("***Operator***"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA.  In furtherance and not in limitation of the foregoing, Guarantor does hereby agree as follows:

1.      Guarantor does hereby waive all defenses that may be available to it as a surety under the laws of the State to the enforcement of obligations hereunder including, but not limited to, the following:

(a)      all notice of acceptance hereof, protest, demand and dishonor, presentment and demands of any kind now or hereafter provided for by any statute or rule of law;

(b)      any and all requirements that Operator institute any action or proceeding, or exhaust any or all of Operator's rights, remedies or recourse, against Operator or anyone else as a condition precedent to bringing an action against Guarantor under this Guaranty, it being expressly agreed that the liability of Guarantor hereunder shall be primary and not secondary;

(c)      any defense arising by reason of any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, minority, dissolution or any other defense of New Operator, its successors and assigns, or Guarantor (even though rendering same void, unenforceable or otherwise uncollectible), it being agreed that Guarantor shall remain liable hereon regardless of whether New Operator or any other such person be found not liable thereon for any reason;

(d)      the benefits of any and all statutes, laws, rules or regulations applicable in the State which may require the prior or concurrent joinder of any other party to any action on this Guaranty or which may require the exhaustion of remedies prior to a suit on this Guaranty, all as amended from time to time;

(e)      any claim Guarantor or New Operator might otherwise have against Operator by virtue of any right, remedy or recourse permitted it or them at law or equity;

(f)      any failure, omission, delay or lack on the part of New Operator or Operator to enforce, assert or exercise any right, power or remedy conferred on New Operator, Guarantor or Operator in this Guaranty or the OTA or any action on the part of Operator granting a waiver, indulgence or extension to New Operator or Guarantor;

(g)      the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets of New Operator, marshaling of assets or liabilities, receiverships, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceeding affecting New Operator or any of its assets, or the disaffirmance of the OTA or any of its obligations thereunder in any such proceeding; and

(h)      any and all rights and defenses that Guarantor may have because the obligations

**EXHIBIT A**

of New Operator guaranteed hereby relate to real property.

2.     Guarantor agrees that no acts or omissions of Operator taken after the date hereof shall in any way release, diminish or affect the absolute nature of Guarantor's obligations and liabilities hereunder.  Guarantor's obligations and liabilities under this Guaranty are primary, absolute and unconditional under any and all circumstances and until the obligations of New Operator under the OTA are fully and finally satisfied, such obligations and liabilities shall not be discharged or released, in whole or in part, by any act or occurrence which might, but for this Section 2, be deemed a legal or equitable discharge or release of Guarantor.

3.     Guarantor does hereby acknowledge that it is executing this Guaranty knowingly and voluntarily and that the execution of this Guaranty is a material inducement to the willingness of Operator to enter into the OTA and consummate the transaction provided for therein.

4.     Guarantor does hereby represent and warrant that it has full power and authority to enter into this Guaranty and that this Guaranty is the valid and binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms except as such enforceability may be limited by creditors rights laws and general principals of equity.

5.     All rights, remedies and recourse afforded to Operator by reason of this Guaranty, or otherwise, are separate and cumulative and may be pursued separately, successively or concurrently, as occasion therefor shall arise and are non-exclusive and shall in no way limit or prejudice any other legal or equitable right, remedy or recourse which Operator may have.

6.     If for any reason whatsoever New Operator now or hereafter becomes indebted to Guarantor or any affiliate of any Guarantor, such indebtedness and all interest thereon shall at all times be subordinate in all respects to the obligations of New Operator to Operator under the OTA.

7.     If any provision of this Guaranty or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

8.     In the event any legal action or proceeding is commenced to interpret or enforce the terms of, or obligations arising out of, this Guaranty, or to recover damages for the breach thereof, the party prevailing in any such action or proceedings shall be entitled to recover from the non-prevailing party all reasonable attorneys' fees and reasonable costs and expenses incurred by the prevailing party. As used herein, "attorneys' fees" shall mean the fees and expenses of counsel to the parties hereto, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney.  The term "attorneys' fees" shall also include, without limitation, all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings.

9.     Any notices or demands under this Guaranty shall be sent to Operator at its address set forth in the OTA and to Guarantor at the address set forth in the OTA for New Operator.

10.     This Guaranty shall be governed by and construed in accordance with the laws of the State of _____ without regard to principles of conflicts of law.

11.     The obligations of Guarantor under this Guaranty shall terminate after New Operator has fulfilled all of its obligations under the OTA (the "*Termination Date*") except with respect to any claims

54580075.2

**EXHIBIT A**

made by Operator against New Operator under the OTA or against Guarantor hereunder prior to the Termination Date, as to which claims this Guaranty shall survive until the full and final resolution thereof.

*Guaranty*
*-Signature Page*

     IN WITNESS WHEREOF, the undersigned hereby execute this Guaranty as of the day and year first set forth above.

**GUARANTOR:**

_____

54580075.2

**EXHIBIT A**

<u>EXHIBIT 34</u>

**OPERATOR GUARANTY**

As of the ___ day of _____, 20___, by their signatures set forth below, _____ (individually and collectively as the context may require, the "Guarantor") hereby agree to absolutely and unconditionally guarantee, on a joint and several basis, the full and complete payment and performance by _____, a _____ ("Operator") of all of its obligations under the Operations Transfer Agreement dated as of _____, 2016 (the "OTA") by and between Operator and _____, a _____ ("New Operator"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA. In furtherance and not in limitation of the foregoing, Guarantor does hereby agree as follows:

1. Guarantor does hereby waive all defenses that may be available to it as a surety under the laws of the State to the enforcement of obligations hereunder, including, but not limited to, the following:

(a)    all notice of acceptance hereof, protest, demand and dishonor, presentment and demands of any kind now or hereafter provided for by any statute or rule of law;

(b)    any and all requirements that New Operator institute any action or proceeding, or exhaust any or all of New Operator's rights, remedies or recourse, against New Operator or anyone else as a condition precedent to bringing an action against Guarantor under this Guaranty, it being expressly agreed that the liability of Guarantor hereunder shall be primary and not secondary;

(c)    any defense arising by reason of any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, minority, dissolution or any other defense of Operator, its successors and assigns, or Guarantor (even though rendering same void, unenforceable or otherwise uncollectible), it being agreed that Guarantor shall remain liable hereon regardless of whether Operator or any other such person be found not liable thereon for any reason;

(d)    the benefits of any and all statutes, laws, rules or regulations applicable in the State which may require the prior or concurrent joinder of any other party to any action on this Guaranty or which may require the exhaustion of remedies prior to a suit on this Guaranty, all as amended from time to time;

(e)    any claim Guarantor or Operator might otherwise have against New Operator by virtue of any right, remedy or recourse permitted it or them at law or equity;

(f)    any failure, omission, delay or lack on the part of Operator or New Operator to enforce, assert or exercise any right, power or remedy conferred on Operator, Guarantor or New Operator in this Guaranty or the OTA or any action on the part of New Operator granting a waiver, indulgence or extension to Operator or Guarantor;

**EXHIBIT A**

(g)     the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets of Operator, marshaling of assets or liabilities, receiverships, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceeding affecting Operator or any of its assets, or the disaffirmance of the OTA or any of its obligations thereunder in any such proceeding; and

(h)     any and all rights and defenses that Guarantor may have because the obligations of Operator guaranteed hereby relate to real property.

2.     Guarantor agrees that no acts or omissions of New Operator taken after the date hereof shall in any way release, diminish, or affect the absolute nature of Guarantor's obligations and liabilities hereunder.  Guarantor's obligations and liabilities under this Guaranty are primary, absolute and unconditional under any and all circumstances and until the obligations of Operator under the OTA are fully and finally satisfied, such obligations and liabilities shall not be discharged or released, in whole or in part, by any act or occurrence which might, but for this Section 2, be deemed a legal or equitable discharge or release of Guarantor.

3.     Guarantor does hereby acknowledge that it is executing this Guaranty knowingly and voluntarily and that the execution of this Guaranty is a material inducement to the willingness of New Operator to enter into the OTA and consummate the transaction provided for therein.

4.     Guarantor does hereby represent and warrant that it has full power and authority to enter into this Guaranty and that this Guaranty is the valid and binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms except as such enforceability may be limited by creditors rights laws and general principals of equity.

5.     All rights, remedies and recourse afforded to New Operator by reason of this Guaranty, or otherwise, are separate and cumulative and may be pursued separately, successively or concurrently, as occasion therefor shall arise and are non-exclusive and shall in no way limit or prejudice any other legal or equitable right, remedy or recourse which New Operator may have.

6.     If for any reason whatsoever Operator now or hereafter becomes indebted to Guarantor or any affiliate of any Guarantor, such indebtedness and all interest thereon shall at all times be subordinate in all respects to the obligations of Operator to New Operator under the OTA.

7.     If any provision of this Guaranty or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Guaranty nor the application of such provision to any other persons or circumstances shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

8.     In the event any legal action or proceeding is commenced to interpret or enforce

**EXHIBIT A**

the terms of, or obligations arising out of, this Guaranty, or to recover damages for the breach thereof, the party prevailing in any such action or proceedings shall be entitled to recover from the non-prevailing party all reasonable attorneys' fees and reasonable costs and expenses incurred by the prevailing party.  As used herein, "attorneys' fees" shall mean the fees and expenses of counsel to the parties hereto, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney.  The term "attorneys' fees" shall also include, without limitation, all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings.

9.      Any notices or demands under this Guaranty shall be sent to New Operator at its address set forth in the OTA and to Guarantor at the address set forth in the OTA for Operator.

10.      This Guaranty shall be governed by and construed in accordance with the laws of the State without regard to principles of conflicts of law.

11.      The obligations of Guarantor under this Guaranty shall terminate after Operator has fulfilled all of its obligations under the OTA (the "Termination Date") except with respect to any claims made by New Operator against Operator under the OTA or against Guarantor hereunder prior to the Termination Date, as to which claims this Guaranty shall survive until the full and final resolution thereof.

**[SIGNATURES ON FOLLOWING PAGE]**

**EXHIBIT A**

IN WITNESS WHEREOF, the undersigned hereby execute this Guaranty as of the day and year first set forth above.

**GUARANTOR:**

_____

**EXHIBIT A**

<u>Exhibit 35</u>

**New Operator Guarantor Entities**

**COTTONWOOD HEALTHCARE, LLC,**
a Nebraska limited liability company

**GREAT PLAINS HEALTHCARE, LLC,**
a Kansas limited liability company

**SKYLINE HEALTH CARE LLC,**
a New Jersey limited liability company

**SKYLINE ARKANSAS HOLDINGS, LLC,**
an Arkansas limited liability company

**SKYLINE CHP HOLDINGS, LLC,**
an Arkansas limited liability company

**SKYLINE ARKANSAS HEALTHCARE, LLC,**
an Arkansas limited liability company

**PRINCE OF PERSIA HEALTHCARE, LLC,**
an Arkansas limited liability company

**LITTLE ARK INVESTMENTS LLC,**
an Arkansas limited liability company

**ARIAL INVESTMENTS, LLC,**
a Delaware limited liability company

**SUN ISLAND CAPITAL, LLC,**
a Florida limited liability company

**CARE PLUS MA, LLC,**
a Massachusetts limited liability company

**CARE PLUS REALTY, LLC,**
a Massachusetts limited liability company

**EXHIBIT A**

*Golden LivingCenter – Broken Bow*

## SCHEDULES

The following Disclosure Schedules are provided pursuant to that certain Operations Transfer Agreement (the "***Transfer Agreement***") made and entered into as of August 26, 2016, by and between Operator and New Operator.  These Disclosure Schedules are hereby incorporated in and made a part of the Transfer Agreement as if set forth in full therein and are an integral part of the Transfer Agreement.

Capitalized terms not otherwise defined in these Disclosure Schedules shall have the meanings set forth in the Transfer Agreement.

The information contained in these Disclosure Schedules shall be deemed to qualify to the specific section (or subsection, as appropriate) of the Transfer Agreement to which it corresponds, and to any other section or subsection to the extent the relevance of such disclosure to the subject matter of such other section or subsection is reasonably apparent.  The headings contained in these Disclosure Schedules are included for convenience only, and are not intended to limit the effect of the disclosures contained in such schedule or to expand the scope of the information required to be disclosed in such schedule. Matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Transfer Agreement to be reflected herein; additional matters are set forth for informational purposes and the fact that any item of information is disclosed in these Disclosure Schedules shall not be construed to mean that such information is required to be disclosed by the Transfer Agreement.  Any information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the term "material" or other similar terms in the Transfer Agreement or constitute an admission that such items are required to be disclosed under the Transfer Agreement.

Golden LivingCenter – Broken Bow

**EXHIBIT A**

## SCHEDULE 2(B)

### Excluded Assets

A.    All of Operator's right, title and interest in the accounts receivable of the Facility for services that have been rendered prior to the Closing Date.

B.    Cash and cash equivalents on hand at the Facility, as of the Closing Date, except for Patient Trust Funds and petty cash, which shall be delivered to New Operator in accordance with the Transfer Agreement or as otherwise expressly provided in the Transfer Agreement.

C.    All Facility insurance policies.

D.    All refunds or reimbursements of whatever nature or description which relate to or are attributable to the period through the Closing Date and all deposits, escrowed funds and similar funds, except as otherwise expressly provided in this Transfer Agreement.

E.    All claims, disputes and litigation against third parties, and all amounts of any nature or description relating thereto, to the extent such dispute, claim or litigation is related to the period through the Closing Date.

F.    Except as otherwise specifically provided in this Transfer Agreement, proprietary materials of Operator respecting its ownership and operation of the Property, including, but not limited to, internal financial information, internal employee records, dietary menu manuals, contracts and forms promulgated by Operator or any affiliate of Operator.

G.    All operating agreements and contracts and rights thereunder for supplies and/or services supplied to the Facility (including those contracts of a national nature), unless such agreement and contract is an Assumed Contract.

H.    Micro fiche readers.

I.    Training tapes and miscellaneous in-service training materials.

J.    "Hot Line" posters.

K.    "Employee of the Month" plaques and stands.

L.    Business brochures and marketing manuals.

M.    Employee "Dress for Success" and "professional" mirrors.

N.    New uniforms in stock at the Closing Date.

O.    Any right to the use of any of the following names, designs or marks: "Golden", "Golden Living Center", or "GGNSC", and any variation, derivative or combination thereof and associated trademarks, service marks and logos; and any other names, designs, or marks

**EXHIBIT A**

under which Operator or its affiliates may have operated (including, without limitation, "Beverly", "Beverly Living Center", "Beverly Healthcare", and "Leisure Lodges").

P.      Xerox Copiers leased by an affiliate.

Q.      Any Med Carts which are not the property of Operator.

R.      Closed patient records and closed employee records (except for those pertaining to Transferred Employees).

S.      Owned or leased vehicles.

T.      Any equipment leased or owned by AEGIS Therapies, Inc. (including, but not limited to, Nautilus and GEM equipment, and computers, laptops, handheld devices, and IT equipment) and, to the extent owned or leased by Alixa RX or a pharmacy provider, any institutional pharmacy equipment and inventory on site.

U.      Pitney Bowes equipment.

V.      Computers, laptop computers, servers, routers, networking system, IT equipment, and all software (loaded to any computer whether a laptop or a computer that is included in Equipment or otherwise) including, but not limited to, dietary and billing software.  Additionally, any time clocks and related software.

W.      Any leased telephone systems.

X.      Software that (i) is not freely transferrable by the terms of any license agreement respecting the same, or (ii) is used by Operator or its affiliates beyond the Facility, including as part of a larger corporate, administration, management and/or recordkeeping system respecting Operator's other properties and businesses, including accounting and database software, EMR software and other software that is used by other facilities owned or operated by Operator or its affiliates.

Y.      Operator's attorney-client privilege.

Z.      Landlord Personal Property under the Master Lease and Assignments.

**EXHIBIT A**

## SCHEDULE 8(A)

### Due To/Due From

| Resident Name | Posting Month | Resident Number | Deposit Date | Deposited by New Operator | | | Deposited by Golden Living | | | Cumulative Balance | Comments |
| | | | | Total Payment | New Operator Amount | Golden Living Amount | Total Payment | New Operator Amount | Golden Living Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| | | | | $- | | | $- | | | $- | |
| **Totals** | | | | $- | $- | $- | $- | $- | $- | | |

Due to Golden Living:                              $ -
Total Payments Received:                           $ -
Net Due To (From) Golden Living:                   $ -

**EXHIBIT A**

## SCHEDULE 8(C)

### Deviations of Income

To be delivered at Closing.

**EXHIBIT A**

## <u>SCHEDULE 8(D)</u>

### Pending Resident Medicaid Applications

To be delivered at Closing.

**EXHIBIT A**

## SCHEDULE 13

**Assumed Contracts**

1. Medicare Provider Agreement

To be delivered by New Operator.

**EXHIBIT A**

## SCHEDULE 14.1(D)

### Permitted Liens

None.

**EXHIBIT A**

## SCHEDULE 14.1(F)

### Facility Financial Statements

None.

**EXHIBIT A**

## SCHEDULE 14.1(G)

### Material Adverse Change

None.

**EXHIBIT A**

## SCHEDULE 14.1(J)

### Loss Run Reports

None.

**EXHIBIT A**